HENRY PAKARINEN v. BUTLER BROS.[1]

December 1, 1944.

No. 33,817.

[1]Reported in 16 N. W. (2d) 769.

*Doherty, Rumble, Butler, Sullivan & Mitchell,* for appellant.
*Ryan, Ryan & Ryan,* for respondent.

LORING, CHIEF JUSTICE.

Pakarinen sued under the fair labor standards act of 1938 for overtime wages, an equal amount as liquidated damages, and attorneys' fees as provided in the act. The defendant contended that plaintiff was an "executive" and therefore within the exemptions of the act. The case was tried before a jury, which returned a verdict for plaintiff for $2,710.80. This is an appeal from an order denying an alternative motion for judgment or a new trial.

Plaintiff was employed by defendant during the period from October 24, 1938, through January 11, 1942, in the Merritt Mine near Crosby, Minnesota. The mine was not being operated all the time during the period from October 24, 1938, to April 1, 1940. There is evidence tending to prove that it was in production from October 24, 1938, to January 1, 1939. Later that winter, it was not in production for a "couple months" and again, for a short time, in the "fall of 1939."

From April 1, 1940, until plaintiff left the employment of defendant January 11, 1942, the mine was in production.

When the mine was not in production, plaintiff worked with the other men repairing the drifts and pumping water out of the mine. When the mine was in production, he acted as a shift boss. This position placed him over the general laborers in the mine, almost all of whom were somewhat skilled in their respective work. The captain was over the shift boss, and the mine superintendent over him.

The captain was the operating head of the mine. He planned out drifts, crosscuts, raises, etc.; also, he gave orders to the shift bosses as to where the work was to be done; the number of men to be used; the number of hours to be worked; and the amount of ore to be taken. The duties of the shift boss were to pass on to the men the orders received from the captain regarding the above-mentioned details; to see that the men were on the job and doing their work properly; to keep time and other data as to the progress of the work. Besides moving from gang to gang to see that things were going right, plaintiff testified that he took tools to the men and spent time fixing fuses to be used in dynamiting; that sometimes the men themselves did this but that often he did it.

All hiring of men was done from the personnel office. Plaintiff never discharged anyone, but on two occasions he sent a man home for intoxication. He did not know what happened to one of these men. He tried unsuccessfully to have the other returned to work. There were statements tending to prove that he did not have power to discharge a man and again that he did, and that a man would not be returned to work if, in the judgment of the shift boss's superiors and the union, he should have been discharged.

Plaintiff claims that, regardless of the overtime he worked in a day, he would record but eight hours. He did not keep a record of his alleged overtime nor did he enter it in the time book. He asserted that he was told it was not necessary to do this because he was not entitled to overtime. Covering the time when the mine was in production, plaintiff claimed to have worked the following hours at the following salaries:

October 24, 1938, to January 1, 1939, eight hours per day, seven days per week at $5.25 per day.

January 1, 1939, to April 1, 1940, nine and one-half hours per day, six days per week, at a salary of $171.

April 1, 1940, to May 1, 1941, nine and one-half hours per day actually, six days per week, at a salary of $190.

May 1, 1941, to January 12, 1942, nine and one-half hours per day, six days per week, at a salary of $210.

Besides, plaintiff claimed to have worked every second Sunday in 1941, and also Sundays in 1940, but he was not sure how many. He admitted that he was sick eight days in 1941 and that over the entire period of employment under the act he received 11 days' vacation.

Defendant introduced evidence to show what overtime plaintiff had put in according to the records. They showed the following overtime:

October 24, 1938, up to October 24, 1939, 236 hours.

October 24, 1939, through October 23, 1940, 288 hours.

October 24, 1940, through January 11, 1942, 480 hours.

They showed that plaintiff had worked some 20 Sundays over the entire period, 11 during 1939 and 1940. Also, it was admitted that there was overtime put in at the end of the month in an effort to get all the mined ore to the surface in order to fill a quota and to complete the miners' pay. Plaintiff had claimed this and placed the amount at about three hours a day, but whether it was one, two, or three days per month was in conflict.

Defendant asserted that plaintiff was paid for 390 hours within a 14-week period for which he did not work. Against this, plaintiff testified that, when they were pumping water out of the mine, they did not mark the time in the time book but kept a daily report.

The mine superintendent testified, and it was not disputed, that 99 percent of the ore mined was for shipment outside the state.

Section 13 (a) of the fair labor standards act of 1938[2] (29 USCA, § 213[a]) provides as follows:

"The provisions of sections 6 and 7 [sections 206 and 207, respectively, fixing minimum wages and maximum hours] shall not apply with respect to (1) any employee employed in a bona fide executive * * * capacity * * * (as such terms are defined and delimited by regulations of the Administrator) ; * * *."

The regulations in force from October 24, 1938, to October 24, 1940, defined "bona fide executive" employe as an employe—

"whose primary duty is the management of the establishment, or a customarily recognized department thereof, in which he is employed, and who customarily and regularly directs the work of other employees therein, and who has the authority to hire and fire other employees or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and who customarily and regularly exercises discretionary powers, and who does no substantial amount of work of the same nature as that performed by non-exempt employees of the employer, and who is compensated for his services at not less than $30 (exclusive of board, lodging, or other facilities) for a workweek."

A new definition was made effective October 24, 1940, which is as follows:

"* * * shall mean any employee

"(A) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

"(B) who customarily and regularly directs the work of other employees therein, and

"(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing

---

[2] 52 Stat. p. 1067, c. 676.

and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

"(D) who customarily and regularly exercises discretionary powers, and

"(E) who is compensated for his services on a salary basis of not less than $30 per week (exclusive of board, lodging, or other facilities), and

"(F) whose hours of work of the same nature as that performed by nonexempt employees do not exceed twenty per cent of the number of hours worked in the workweek by the nonexempt employees under his direction; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment."

Defendant contends that it was error to submit the question to the jury as to whether plaintiff was an "executive" within the act and that the court should have ruled that he was as a matter of law. The principal questions presented for decision are: Did the trial court err in holding, as a matter of law, that defendant was engaged in interstate commerce? Was it for the jury to determine whether plaintiff was an "executive" within the meaning of the definition formulated by the administrator, as authorized by the act? Is the evidence sufficient to sustain the verdict as to the amount of wages that should have been paid to plaintiff for overtime work?

■ True, plaintiff had the burden of proving that he was engaged in interstate commerce or in the production of goods for commerce, but under the decisions of the United States Supreme Court, which are binding on this court, defendant and this employe were clearly so engaged. Warren-Bradshaw Drilling Co. v. Hall, 317 U. S. 88, 63 S. Ct. 125, 87 L. ed. 83; A. B. Kirschbaum Co. v. Walling, 316 U. S. 517, 62 S. Ct. 1116, 86 L. ed. 1638.

■ The question is not whether plaintiff was employed in an "executive" capacity within the meaning of the phrase in common usage, as defendant has argued, but whether he was so employed

within the definition promulgated by the administrator under the authority of law. Smith v. Porter (8 Cir.) (1944) 143 F. (2d) 292.

Before an employe may be denied the right to payment for overtime on the ground that he is an "executive," all six of the conditions laid down by the administrator in the regulations must be fulfilled. Helliwell v. Haberman (2 Cir.) (1944) 140 F. (2d) 833; Fanelli v. United States Gypsum Co. (2 Cir.) (1944) 141 F. (2d) 216; George Lawley & Son Corp. v. South (1 Cir.) (1944) 140 F. (2d) 439, 151 A. L. R. 1081; Smith v. Porter, *supra;* Zaetz v. General Instrument Corp. 21 N. J. Misc. 76, 30 A. (2d) 504.

The burden of proving that an employe is an "executive" rests upon the employer. Smith v. Porter and Helliwell v. Haberman, *supra.*

Assuming that plaintiff was one who "customarily and regularly directs the work of other employees" and was one "who customarily and regularly exercises discretionary powers," the wage requirement having been met, defendant still had the burden of proving that plaintiff was within all the other terms of the administrative definition of an "executive." The evidence as to the 20-percent-work requirement was slight but, nevertheless, a question of fact. There was conflict as to the management and hire-and-fire elements of the definition. The evidence as to both was such that the jury could reasonably find that plaintiff was not within these provisions. Fanelli v. United States Gypsum Co. (2 Cir.) (1944) 141 F. (2d) 216, *supra.*

■ As to the overtime compensation, the burden was upon plaintiff to prove that he worked overtime and to show how much overtime. Wilkinson v. Noland Co. (D. C.) (1941) 40 F. Supp. 1009; Joseph v. Ray (10 Cir.) (1943) 139 F. (2d) 409.

The evidence covering the time when the mine was producing was sufficiently accurate and presented a fact question for the jury.

Defendant introduced evidence from its time books to show the amount of overtime plaintiff had worked. This covered the complete period of employment with the company under the act, including the time the mine was not in production. Therefore, con-

sidering these records in connection with plaintiff's testimony, the jury did not have to engage in speculation in regard to the period of time when the mine was not in production, or as to the overtime while it was in production. Viewing the evidence as a whole, the verdict of the jury is reasonably supported by it.

■ Defendant's contention that the union contracts with it were erroneously excluded is without merit. They were irrelevant. The administrator's definition controlled the problem of whether plaintiff was an executive.

5. The challenge to the correctness of the charge does not merit discussion.

Order affirmed.

