S. H. STEVENS AND ANOTHER, *d. b. a.* SLEET-SHAVER MFG. COMPANY, v. FEDERAL CARTRIDGE CORPORATION, *d. b. a.* TWIN CITIES ORDNANCE PLANT.[1]

April 23, 1948.

No. 34,617.

[1]Reported in 32 N. W. (2d) 312.

*Clarence O. Holten* and *James S. Eriksson,* for appellants.

*Victor E. Anderson,* United States Attorney, and *Linus J. Hammond,* Assistant United States Attorney, for respondent.

FRANK T. GALLAGHER, JUSTICE.

Plaintiff appeals from an order overruling its demurrer to defendant's answer insofar as it relates to the defense that plaintiff had not exhausted the administrative remedies provided by the Contract Settlement Act of 1944, 41 USCA, §§ 101 to 125, and by U. S. Public Law 657, c. 864 (approved August 7, 1946), and the rules and regulations promulgated thereunder. The court below certified that the question raised by plaintiff's demurrer is important and doubtful.

Defendant is a corporation which was engaged by the United States government during the period from 1941 to 1945 as a prime contractor with the war department to operate and manage the Twin Cities Ordnance Plant, a government arsenal at New Brighton, Minnesota, to manufacture ammunition exclusively for the government during the war. Plaintiff, a copartnership, is a subcontractor which on or about August 28, 1944, entered into a written agreement with defendant under which defendant agreed to furnish to plaintiff, and plaintiff agreed to repair and recondition, on a fixed-price basis, 200,000 ammunition boxes to be used by defendant for the boxing and storage of ammunition. On October 18, 1944, defendant gave formal notice to plaintiff that the repair operation was terminated and that no additional boxes would be sent to plaintiff for repair after that date. At that time, approximately 186,000 boxes had been delivered to plaintiff for repair, but only 93,080 boxes had been accepted by defendant as repaired. Plaintiff seeks to recover $41,769.96 as the reasonable value of services rendered and materials supplied between October 7 and November 22, 1944, in the repair and recon-

ditioning of ammunition boxes. Defendant admits a liability of $2,965.47, for which it has tendered payment. As to any further liability, defendant alleges in its answer:

"* * * Pursuant to the Contract Settlement Act, Title 41, U. S. Code, Secs. 101 to 125, the defendant requested of plaintiff that it prepare and file its claim with defendant for such claimed additional benefits on the forms provided for that purpose, and as provided by the joint termination regulations promulgated pursuant to the Contract Termination [Settlement] Act, but the plaintiff has refused and neglected to prepare and submit its claim so prepared, as that Act provides or as provided by Public Law 657, Chapter 864, 79th United States Congress, entitled 'An Act to authorize relief in certain cases where work, supplies or services have been furnished to the Government under contracts during the war,' which Act was approved on August 7, 1946."

Defendant further alleges that by reason of plaintiff's failure to comply with the provisions of the acts mentioned plaintiff had not exhausted the administrative remedies provided for the submission and adjustment of their claim, and that until such action was taken the court had no jurisdiction of the subject matter of the action. Plaintiff demurred to that defense, and, as stated, this appeal was taken from the order of the trial court overruling the demurrer.

The question presented is whether it is necessary for plaintiff subcontractor to first prepare and file a claim against defendant prime contractor on forms prescribed either by the Joint Termination Regulation issued pursuant to the Contract Settlement Act of 1944 or by U. S. Public Law 657 before the subcontractor can sue the prime contractor for services performed and materials supplied under the contract, when the contract between the parties does not contain any provision for its termination and it is terminated by the prime contractor before it is performed. Plaintiff claims that it is not necessary to file such claim, on the ground that there is no provision in the contract or in the Contract Settlement Act requiring it to file such claim with defendant before commencing suit.

At the outset, it must be stated that an examination of the Contract Settlement Act and regulations issued thereunder discloses no express language which specifically requires a subcontractor to attempt to make a settlement with his prime contractor before bringing suit in a court of law. Granting that, the issue then resolves itself into whether there is such ambiguity in the language of the Contract Settlement Act as to make it reasonably susceptible of more than one interpretation. If there is such ambiguity, what, then, was the intent of congress in passing the act?

Plaintiff does not question the power of congress to enact a statute requiring contractors and subcontractors to comply with administrative procedures of the type involved in this act as a condition precedent to bringing an action in a court of law. That congress, under the war powers granted it under the federal constitution, may generally employ such measures as are necessary and appropriate to provide for the common defense and to wage war is established by clear authority. Hirabayashi v. United States, 320 U. S. 81, 63 S. Ct. 1375, 87 L. ed. 1774. This power is given by the constitution to meet the emergency of war and permits the harnessing of the entire energies of the people in a supreme coöperative effort to preserve the nation. Home Bldg. & Loan Assn. v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. ed. 413, 88 A. L. R. 1481. Plaintiff concedes, therefore, that congress, under its war powers, could make, modify, and terminate war contracts, and that the Contract Settlement Act and the regulations issued thereunder, to the extent that they applied to the parties, became binding upon the respective parties. Plaintiff also concedes that a requirement that a war contractor file a formal claim for additional compensation under a terminated war contract before commencement of suit is not an unreasonable requirement. Plaintiff contends only that the Contract Settlement Act was not intended by congress to impose such a condition precedent to the enforcement of its rights *as a subcontractor against a prime contractor* in a court of law. It is established law that the decisions of the United States Supreme Court on the construction of a federal statute are binding on state courts. Pakarinen v. Butler Bros. 218

Minn. 496, 16 N. W. (2d) 769. In the case at bar, counsel have called our attention to no federal decisions directly governing this case, nor have we discovered any.

Our attention has been directed to Aircraft & Diesel Equip. Corp. v. Hirsch, 331 U. S. 752, 67 S. Ct. 1493, 91 L. ed. 1796, a case not involving the Contract Settlement Act, but closely analogous as to the legal principle involved. In that case, while proceedings were pending in the tax court for a redetermination of excessive profits determined by the Secretary of War and the War Contracts Price Adjustment Board to have been realized by a subcontractor on production of war equipment, the subcontractor sued in a district court for a declaratory judgment that the Renegotiation Acts were unconstitutional and for an injunction against further proceedings thereunder. The United States Supreme Court affirmed the lower court's dismissal of the suit. The Supreme Court said (331 U. S. 767, 67 S. Ct. 1500, 91 L. ed. 1806) :

"The very purpose of providing either an exclusive or an initial and preliminary administrative determination is to secure the administrative judgment either, in the one case, in substitution for judicial decision or, in the other, as foundation for or perchance to make unnecessary later judicial proceedings. Where Congress has clearly commanded that administrative judgment be taken initially or exclusively, the courts have no lawful function to anticipate the administrative decision with their own, whether or not when it has been rendered they may intervene either in presumed accordance with Congress' will or because, for constitutional reasons, its will to exclude them has been exerted in an invalid manner. To do this not only would contravene the will of Congress as a matter of restricting or deferring judicial action. It would nullify the congressional objects in providing the administrative determination."

Inasmuch as the above case did not involve an interpretation of the Contract Settlement Act, we cannot consider it as controlling, but shall give it weight by analogy in our determination of the issue involved.

Here, the trial court's memorandum indicates that it relied on both the Contract Settlement Act and Public Law 657 for support of its order overruling the demurrer. On appeal to this court, however, defendant does not appear to rely upon Public Law 657, since it does not include a reference thereto in its statement of the question presented, and in its brief it appears to doubt its application in view of plaintiff's failure to file a claim thereunder. As the trial court relied upon Public Law 657 more to confirm its interpretation of the Contract Settlement Act than as an independent basis of decision, we here confine our consideration to the Contract Settlement Act.

Under the title INTERPRETATION OF STATUTES, M. S. A. 645.16 provides as follows:

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature. Every law shall be construed, if possible, to give effect to all its provisions.

"When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit.

"When the words of a law are not explicit, the intention of the legislature may be ascertained by considering, among other matters:

"(1) The occasion and necessity for the law;

"(2) The circumstances under which it was enacted;

"(3) The mischief to be remedied;

"(4) The object to be attained;

"(5) The former law, if any, including other laws upon the same or similar subjects;

"(6) The consequences of a particular interpretation;

"(7) The contemporaneous legislative history; and

"(8) Legislative and administrative interpretations of the statute."

It is the duty of the court so to construe statutory enactments as to give effect to the obvious legislative intent. McSherry v. City of St. Paul, 202 Minn. 102, 277 N. W. 541; Judd v. Landin, 211 Minn. 465, 1 N. W. (2d) 861; Gleason v. Geary, 214 Minn. 499, 8 N. W. (2d) 808. The issue may therefore be further narrowed to the point

of inquiring whether there is any provision or provisions in either the act or in the regulations promulgated thereunder from which it must *necessarily be implied* that congress intended that it should be a condition precedent to the commencement of an action in the courts by a subcontractor against a prime contractor that the subcontractor first comply with the provisions of the Contract Settlement Act and file a formal claim on the blanks provided by the regulations made under the act. Plaintiff contends that it is not here concerned with the rights and obligations as between the prime contractor and the government, but solely with the relationship between it as a subcontractor and defendant as a prime contractor, and further that it is not concerned with claims as to a continuing contract, but only with claims under a terminated contract. While we agree that the principal question involves the relationship between the subcontractor and the prime contractor, we believe that in attempting to interpret the Contract Settlement Act we must also consider the rights and obligations as between the prime contractor and the government as evidence of the congressional intent in passing the act. We cannot see that it is material whether plaintiff's claim is under a terminated or a continuing contract, as the amount involved in either case would be the issue that would have to be determined either administratively under the act or judicially by the court.

Considering the language of the entire Contract Settlement Act and of the regulations made under it, we are satisfied that it is sufficiently ambiguous to require us to determine what the congressional intent was in passing the act. In determining congressional or legislative intent, this court has recognized that the motive or purpose of the legislature in enacting a measure, though not controlling, may properly be considered in aid of construction in case of reasonable doubt. State v. Hosmer, 144 Minn. 342, 175 N. W. 683. Here, it appears from an examination of the entire act that congress enacted a detailed and entire plan for the presentation, negotiation, and settlement of disputes that would arise upon the

modification, change, or termination of war contracts. In § 101 of the act, congress expressly declared the objectives of the act to be:

"(a) to facilitate maximum war production during the war, and to expedite reconversion from war production to civilian production as war conditions permit;

"(b) to assure to prime contractors and subcontractors, small and large, speedy and equitable final settlement of claims under terminated war contracts, and adequate interim financing until such final settlement;

"(c) to assure uniformity among Government agencies in basic policies and administration with respect to such termination settlements and interim financing;

"(d) to facilitate the efficient use of materials, manpower, and facilities for war and civilian purposes by providing prime contractors and subcontractors with notice of termination of their war contracts as far in advance of the cessation of work thereunder as is feasible and consistent with the national security;

"(e) to assure the expeditious removal from the plants of prime contractors and subcontractors of termination inventory not to be retained or sold by the contractor;

"(f) to use all practicable methods compatible with the foregoing objectives to prevent improper payments and to detect and prosecute fraud."

By § 104, congress directs that a deputy director be appointed and that he be empowered to make all needful rules and regulations; and by § 105 a contract settlement advisory board, to be composed of members of agencies of the United States, is authorized. In § 106, the policy of the government is again stated to be to provide war contractors with speedy and fair compensation for the termination of any war contracts in accordance with and subject to the provisions of this chapter. The section also provides a pattern of what costs are allowable in determining "fair compensation." By § 107, the contracting agencies are empowered to allow prime contractors to negotiate and settle subcontractors' claims without review by the contracting agencies where the contracting agencies feel that the

prime contractor is reliable. By § 113, congress prescribed the steps to be taken by the contracting agency where claims are not settled; provides for written findings where claims are denied; for payment of 90 percent of the amount due where it is found that there is an amount due; and for review on appeal by the appeal board or by bringing suit in the court of claims of the United States district court. The time within which such action can be taken is limited. Under § 119 of the act, war contractors are required to keep and maintain their records for a period of five years after the contract is terminated or settled, and the section further provides that any contractor who files a false claim is subject to the criminal provisions of the United States code.

Acting under the authority conferred by § 104 of the act, the director issued a series of regulations establishing policies and procedures for the submission and settlement of terminated war contract claims, and (§ 106) prescribed the factors to be taken into consideration in arriving at "fair compensation." Regulation 8[2] provides in part as follows:

"1.  **Standard Forms provided.** The Standard Forms are prescribed by the Director of Contract Settlement under the Contract Settlement Act of 1944. They are required to be used by all prime contractors and subcontractors in submitting proposals for settlement of claims under terminated fixed-price war supply contracts. This includes fixed-price supply subcontracts underlying cost-plus-fixed-fee prime contracts or subcontracts. The forms should be used by prime contractors for filing with the Government, and by subcontractors for filing with the company from which the notice of termination was received. They have been made uniform for all Departments and agencies of the United States Government in order to expedite preparation and review of settlement proposals. Previously authorized forms of the War Department or Navy Department may continue to be used until the Standard Forms are generally available.

---

[2] 9 Federal Register, p. 12541.

"2. **Departures from Standard Forms.** Although minor deviations from the requirements of the forms are permissible, prior approval of the contracting officer or the customer (contractor in next higher tier) should be obtained for any substantial departures from the requirements. However, a contractor receiving such approval may not require his subcontractors to submit their proposals on other than the prescribed standard forms."

Thereafter, the contracting agencies of the government and the Director of Contract Settlement collaborated in the making and issuing of what has been described as the Joint Termination Regulation,[3] pertaining to this same act. Section 845.526-1 of such regulation provides in part as follows:

"All prime contractors and subcontractors are required to use the standard forms in submitting proposals for settlement of claims under terminated fixed-price war supply contracts, * * *. Minor deviations from the requirements of the forms are permissible, without special approval, but any war contractor must obtain prior approval of the contracting officer or the customer for any substantial deviations."

Section 846.632 of such regulation provides as follows:

"(a) Each war contractor is primarily responsible for reviewing or examining in an appropriate manner all settlement proposals submitted to him by his immediate subcontractors. In making such review or examination, the war contractor should exercise the same standard of care that a business man would employ in the conduct of his own affairs.

"(b) The contractor is required to examine the claims of his subcontractors * * * to an extent he considers adequate under the circumstances. In submitting his own claim, he must certify that he has so examined such claims, and that the settlements of his subcontractors' own charges are fair and reasonable, are allocable to the terminated portion of his contract, were negotiated in good

---

[3] 9 Federal Register, pp. 13316 to 13452, inclusive.

faith, and are not more favorable to the subcontractors than he would make if reimbursement by the Government were not involved."

We need not rely entirely upon our own interpretation of the language of the act to ascertain its purposes as an aid in determining the intent of congress. In reporting on the proposed bill, the Senate Committee on Military Affairs, in Senate Report No. 836, May 2, 1944, stated the need for the proposed legislation in this language (U. S. Code Congressional Service, 78th Cong. 2d Sess. [1944] p. 1162):

"The great need for legislation in the field of contract termination has been emphasized repeatedly by the heads of the Government agencies concerned, as well as by industry and labor groups which have felt the effects of contract termination. The present procedure of contract termination is cumbersome and results in unnecessary delays injurious to our economy. In the event of wholesale terminations in the course of the war, this procedure would, in the opinion of this committee, dangerously impede expeditious reconversion to a peacetime economy."

The fundamental principles of the proposed bill were stated by that committee to be (*Id.* p. 1162):

"(1) Businessmen shall be paid speedily the fair compensation which is due them for the termination of their war contracts; and

"(2) The Government, when paying out such fair compensation, should be carefully protected against waste and fraud.

"Little has to be said as to the need of contractors, and particularly the smaller subcontractors, to obtain speedy and fair settlement of their termination claims. This need has been stated repeatedly and has been pointed out emphatically in the reports dated November 18, 1943, February 9, 1944, and April 7, 1944, of the Senate Special Committee on Post-war Economic Policy and Planning, under the chairmanship of the distinguished senior Senator from Georgia, Mr. George.

"The need for protecting the Government against the waste of funds and fraud is equally clear, and S. 1718 as amended fully protects the Government in the following manner: * * *."

That the committee intended that the act should apply equally to prime contractors and subcontractors is further evidenced by this language contained in its report (*Id.* p. 1163) :

"The legislation states that it is the policy of the Government, and the responsibility of the contracting agencies and the Director, to provide prime and subcontractors with fair compensation for the termination of their war contracts. It further provides that the compensation payable to subcontractors shall be based on the same principles as compensation payable to prime contractors.

"Termination claims of prime contractors and subcontractors may be settled either by agreement or, in case an agreement fails to be reached, by determination on the part of the contracting agency. Wherever it may facilitate settlements, the contracting agencies will have power to deal directly with subcontractors or settle all claims of a contractor on an over-all basis. All settlement agreements are to be final, except in case of fraud and for the purposes of the Renegotiation Act. Any unilateral determination on the part of a contracting agency will be subject to an appeal, which may be taken at the election of the contractor, to the Court of Claims (or if the amount is below $10,000, to a United States district court) or to an appeal board established in accordance with this legislation, or which may be submitted to arbitration where a contracting agency and the contractor agree to arbitration."

The same intention on the part of congress to make this attempt to settle claims by administrative procedure compulsory in order to expedite the settlement of contract claims may be inferred from the report of the House Committee on the Judiciary, in its House Report No. 1590, June 1, 1944, where it used this language with respect to the general aim of the proposed act (*Id.* p. 1166) :

"Present procedures for the settlement of contracts now being terminated are not adequate. Delays in settlement have prevented,

in many cases, the prompt removal of material and supplies and the release of working capital. Adequate plans have not been available for financing during the period of settlement.

"Legislation is needed to take care of such matters as interim financing, payment of interest on claims not settled, providing prompt payments to subcontractors, the authority to make negotiated settlements, appeal procedures, adequate provision for the detection and prosecution of fraud, the financial liability of contracting officers, and prompt removal of termination inventories.

"Hearings on the subject of contract termination have been held by various committees of the Congress. The urgent necessity of legislation dealing with contract termination has been pointed out in the proceedings before these several committees and in the Report on War and Post-war Adjustment Policies submitted by Messrs. Bernard M. Baruch and John M. Hancock on February 15, 1944."

That the United States Supreme Court will look to the legislative history of an act to ascertain the legislative intent is settled by its language in Macauley v. Waterman S. S. Corp. 327 U. S. 540, 544, 66 S. Ct. 712, 714, 90 L. ed. 839, 842.

This court has recognized that a case may properly be found to come within the terms of a statute, by virtue of falling within the policy and purpose of the statute, even where the language of the statute has not specifically included it or even where it appears that the legislature likely gave no consideration to it. Pomeroy v. National City Co. 209 Minn. 155, 158, 296 N. W. 513, 515, 133 A. L. R. 766, where the court said:

"Statutes normally have their policy, their purpose, their reason for being. * * *

"* * * If a case is fairly within the purpose of a statute, it must go to decision thereunder, unless excluded by necessary implication or explicit terms, as by stated exception."

Here, one of the stated purposes in the Contract Settlement Act (§ 101) was to "prevent improper payments and to detect and prosecute fraud." This purpose is also evident from the Senate com-

mittee report. It is well recognized that in the construction of an ambiguous statute it is proper to take into consideration the particular evils at which the legislation is aimed, or the mischief sought to be avoided. Funk v. St. Paul City Ry. Co. 61 Minn. 435, 63 N. W. 1099, 29 L. R. A. 208, 52 A. S. R. 608; Apex Hosiery Co. v. Leader, 310 U. S. 469, 60 S. Ct. 982, 84 L. ed. 1311, 128 A. L. R. 1044.

"Every statute is understood to contain, by implication, if not by its express terms, all such provisions as may be necessary to effectuate its object and purpose, or to make effective the rights, powers, privileges, or jurisdiction which it grants, and also all such collateral and subsidiary consequences as may be fairly and logically inferred from its terms." 6 Dunnell, Dig. § 8949.

In Congdon v. Congdon, 160 Minn. 343, 369, 200 N. W. 76, 85, this court said:

"* * * We must construe a statute with reference to the object it was intended should be accomplished by it. In order to learn this object it is proper to consider the occasion and necessity of the enactment. That construction must be applied that will best advance its object. Whatever is necessarily or plainly implied in a statute is as much a part of it as that which is expressed, * * *."

It appears to us that the claims which subcontractors may make against prime contractors are interrelated to some extent with the claims of prime contractors against the government, and that it was the intention of congress in passing the Contract Settlement Act to provide some administrative procedure for expediting the settlement of the many claims arising out of war contracts without the necessity of litigation; that if such settlement cannot be effected under the procedure set up under the act the aggrieved party can still sue in the courts. For us to hold that the use of this administrative procedure by a subcontractor is permissive only would be to destroy in a large measure the effectiveness of the plan for settlement comprehended and established by the act. The form of the language of the act does not preclude our interpretation of it as mandatory, for this court has held that the use of the word "may" is not decisive.

162

In re Trusteeship Under Will of Jones, 202 Minn. 187, 277 N. W. 899. A statute couched in permissive language may be mandatory when construed in the light of the manifest purpose and intention of the legislature. Farmers Co-operative Elev. Co. v. Enge, 122 Minn. 316, 142 N. W. 328.

Viewing the act in its entirety, both in the light of the positive ends it was designed to accomplish and of the mischief it was designed to foreclose, and aided by the statement of purposes in the Senate and House committee reports, we hold that the intention of congress in passing the Contract Settlement Act was to make an attempt to settle contract claims thereunder a condition precedent to the bringing of an action in a court of law, both for prime contractors and for subcontractors. Since the decision of the court below can be affirmed on these grounds, we do not consider the applicability of Public Law 657, approved August 7, 1946, almost two years after the parties herein entered into the contract involved.

Affirmed.

THOMAS GALLAGHER, JUSTICE (dissenting).

I am of the opinion that the language of the Contract Settlement Act is not ambiguous, and that, since no provision is contained therein which requires a subcontractor to file a formal claim thereunder prior to suit against his prime contractor for sums claimed to be due under the contract, this court is without authority to read such a provision into the act.