## UNITED STATES *v.* ACME OPERATING CORP.
### ET AL.

No. 319. Argued January 16, 1933.—Decided February 6, 1933.

244

Assistant Attorney General Rugg, with whom Solicitor General Thacher and Mr. Erwin N. Griswold were on the brief, for the United States.

Mr. Addison C. Burnham, with whom Messrs. Albert T. Gould, Alfred P. Lowell, Charles H. Bradley, and Walter B. Howe were on the briefs, for respondents.

MR. JUSTICE STONE delivered the opinion of the Court.

This case is here on certiorari, granted on petition of the government, to review a judgment of the Court of Claims in favor of the intervenor, the Liberty Trust Company, respondent here. 74 Ct. Cls. 82. The suit was brought by Acme Operating Corporaton, as plaintiff, to recover just compensation alleged to be due to it as the charterer of two steamships, the "James S. Whitney" and the "H. M. Whitney," the use of which was requisitioned in behalf of the government by the Shipping Board, under the Act of June 15, 1917, c. 29, 40 Stat. 182. The Court of Claims dismissed the petition of the plaintiff, but gave judgment for the intervenor, which claimed as the assignee and successor in interest of the Fidelity Trust Company, mortgagee of the two vessels. The sole question presented by the petition is whether the court was right in giving judgment for the intervenor.

The vessels were each subject to a mortgage of the Fidelity Trust Company, later assigned to the intervenor.

The owners chartered them to the Acme Corporation, plaintiff below, and, at about the same time, they were placed in repair yards for alteration and repairs, the cost of which for each ship was paid only in part. On April 27, 1918, shortly before the maturity of the mortgages, the use of the vessels was requisitioned by the Shipping Board. Having been arrested under libels in admiralty by the construction companies for the balance due for the repairs, they were released to the government by court orders.

August 12, 1918, the United States, through the Shipping Board, entered into a contract with the owners of the ships and the mortgagee, predecessor in interest of the intervenor, by which it was provided that the government should retain from the amounts which would otherwise be due as just compensation for the use of the vessels, its expenditures in behalf of the owners, for transporting to their destinations the cargoes which were in the ships at the time of requisition. If just compensation due " for the requisitioning " of the vessels exceeded the debt to the government, the government was authorized to apply the excess to the payment of the mortgages and liens on the vessels. It was also provided that if the ships should be released from the requisition or returned to the owners before the government should be fully reimbursed for carrying the cargoes forward to destination, the government should have liens upon them for the amount of the unpaid balance, which the owners and the mortgagee agreed should be superior to the mortgage liens.

In December, 1918, requisition charter parties between the government and the owners of the ships were executed as of the date of the requisitions. The charter parties are not set forth in the findings, but they provided that " the owner accepts this requisition charter in full satisfaction of . . . all claims . . . against the United States arising out of the requisition " and accepts

the compensation provided by the charter parties " as the just compensation required by law."

The ships were subsequently released by the government and returned by the Board to the owners, the " H. M. Whitney " on July 8, 1919 and the " James S. Whitney " on July 10, 1919. They were placed in dock for repairs and reconditioning, upon completion of which they were removed by the agent of the owners and Fidelity Trust Co., the mortgagee. The court below found that the Fidelity " advanced and paid," for the account of the owners of the two vessels, a total of $129,299.76 " for sundry services and materials in connection with " the repairs, and gave judgment for the intervenor for that amount.

A final accounting was had between the owners and the government which the court below found to be correct. The account, after crediting to the owners $87,706.84, the estimated cost of reconditioning the ships as fixed by a survey, showed a balance of $77,068.54 still owing to the government for delivering the cargoes which were in the ships at the time of requisition. The total amount due the government at the time the vessels were returned thus exceeded the claim of the intervenor. In September, 1920, the Fidelity Trust Company became financially embarrassed, was taken over by the Massachusetts Commissioner of Banks, and, in April, 1921, its assets were transferred to the intervenor which, for purposes of the present litigation, may be regarded as standing in its stead.

The court below held that the requisition of the use of the ships when they were in the custody of the admiralty court and when the mortgagee was neither in possession nor entitled to possession, did not entitle the mortgagee to compensation; but it nevertheless held that the intervenor was entitled to recover the $129,297.66, which it

expended to repair the vessels after their return by the government, on the ground that "the injury to the vessels themselves was an injury to the *res*" on which the intervenor held a mortgage. In this we think it was in error.

The intervenor endeavors to support the judgment below on the grounds that the injury or depreciation of the vessels while in use by the government under the requisition charters was, in effect, a destruction of them *pro tanto*, which in itself operated as a requisition of the mortgagee's interest, for which just compensation must be paid (see *United States* v. *Welch*, 217 U. S. 333, 339; *A. W. Duckett & Co.* v. *United States*, 266 U. S. 149, 151) and that in any case, the mortgagee's security was impaired to the full extent of the damage done, and it is entitled to recover the cost to it of rehabilitating its security by reconditioning the vessels.

It is unnecessary to consider in detail numerous objections raised by the government to the soundness of these contentions and to the sufficiency of the findings to support them, if sound. It is enough that the agreement of August 12, 1918, between the United States, the owners of the vessels and the mortgagee, which is binding on the intervenor, contemplated that the government should be reimbursed in full for its transportation charges from " the compensation due for requisitioning " the vessels, before any payments of compensation should be made to the mortgagee. To this end, the agreement provided that in the event that the steamers were returned before the government was fully paid for carrying the cargoes, the government should have " and there are hereby created liens upon said steamers and both of them, for the amount of the unpaid balance . . . which amount shall be forthwith due and payable on the release of said steamers or either of them, and which liens the parties . . . agree shall be superior to the mortgage liens." We think the effect of

248

this agreement was to confer upon the claim of the government priority over that of the mortgagee. The superiority of the government's claim to that of the mortgagee is certainly not affected by the fact that the vessels have been returned and the mortgagee seeks not the full amount of its mortgages, but the amount in which it contends its interest has been destroyed or its security impaired.

When the vessels were returned, $164,775.38 was due the government for unpaid transportation charges. The government has credited upon its claim the cost of repairs found reasonable by the survey, $87,706.84. But even if the full amount of $129,297.66, claimed by the intervenor to represent the damage to the vessels while in the service, be regarded as due to the owners and mortgagee as their interests may appear, the most that the mortgagee can ask is that the government's prior claim be reduced by that amount. Even if that is done, the government's claim is not satisfied, or its lien discharged. Hence, there is no foundation upon any theory for the recovery of a money judgment against the government by the intervenor, as mortgagee.

The intervenor seeks also to sustain its recovery upon the ground that it owns the construction liens for repairs and alterations of the vessels before they were requisitioned. The findings show that the claims of the construction companies were acquired by the Fidelity Trust Company and, in 1921, transferred to the intervenor along with the other assets of that company. But no claim founded upon these construction liens was asserted by the intervenor's petition or considered by the court below. The case was decided, as it was evidently tried, on the basis of intervenor's claim upon its mortgages. The status of the liens at the time of the trial is neither revealed by the findings nor mentioned in the opinion; the findings do not admit of a determination of their validity.

The vessels were placed in full repair by the mortgagee; to the extent that they were repaired before the liens were assigned, the lienors could have had no rights against the government for the impairment of their security and they transferred none by the assignments. There is no finding which shows to what extent the repairs had been made at the time of the assignments, although it appears that some of them, at least, were then completed. The intervenor does not say and cannot, on these findings, that it made the repairs to protect the security of the liens rather than that of its own mortgages, which are subordinate to the claims of the government. Accordingly, there is no basis in the findings for contending that the intervenor stands in any better position as the holder of the construction liens than it does as mortgagee.

*Reversed.*