**RUMSEY MFG. CORPORATION et al. v. U. S. HOFFMAN MACHINERY CORPORATION.**

Civ. A. No. 3346.

United States District Court W. D. New York.

Nov. 29, 1949.

Findings of Fact and Conclusions of Law Dec. 29, 1949.

Albert Averbach, Seneca Falls, N. Y., and Theodore C. Bonney, Norwich, N. Y., for plaintiff Rumsey Mfg. Corp.

Wiles & Wiles, Syracuse, N. Y., for plaintiff Arthur T. McAvoy, as trustee; Ben Wiles, Syracuse, N. Y., of counsel.

George L. Grobe, U. S. Atty., Buffalo, N. Y., for defendant; R. Norman Kirchgraber, Asst. U. S. Atty., Buffalo, N. Y., of counsel.

KNIGHT, Chief Judge.

In May and June, 1945, the defendant U. S. Hoffman Machinery Corporation (hereinafter called Hoffman) placed with the Rumsey Manufacturing Company (hereinafter called Rumsey) three purchase orders for machining an aggregate of 654,500 so-called adapters. The total price to be paid was $187,500. Rumsey was a subcontractor of Hoffman, the prime contractor with the Navy Department of the United States. These purchase orders were for war materials, and they were subject to the terms and conditions of the prime contract. Under the prime contract, the Navy, as the contracting agency of the government, had the right to cancel these purchase orders prior to completion. They were cancelled; one on August 20, 1945, and two on September 21, 1945. The notice of cancellation read: "This termination is necessitated by Government's termination of prime contract under which your contract is subcontracted."

At the time of the final termination Rumsey had completed and shipped 34,000 adapters; had 4,750 completed adapters on hand, and the balance of the orders was unfinished or not completed. Rumsey had been paid $10,850.

Rumsey was given a notice to acknowledge receipt of the notice of cancellation and to indicate the intent to file or not to file a claim for damages by reason of the cancellation. It promptly gave notice of its intent to file and on January 24, 1946, filed a claim for $135,376.87. This was sent to Hoffman and later at Hoffman's direction forwarded by Rumsey to the Navy Department. A single claim was first submitted, but the Navy Department required that it be separated as to the three orders. This was done, showing a claim as to Purchase

Order No. 5473 of $9,225.12, and as to Purchase Order No. 40130 and Purchase Order No. 40131, claim of $125,153.27. The claims as so divided were not transmitted to the Navy Department until June, 1946. Numerous conferences followed, and in July, 1946, the cost inspector representing the Navy submitted to Rumsey his recommendations as respects the claim or settlement proposal. In August, 1946, Rumsey submitted to Hoffman a modified statement of its claim. Again conferences followed without result, and on December 8, 1946, Rumsey brought suit. On July 18, 1947, an involuntary petition in bankruptcy was filed against Rumsey, and on August 6, 1947, it was declared bankrupt. Plaintiff McAvoy herein was appointed trustee of the bankrupt's estate, and by order of this court was joined as a party plaintiff.

Purchase Order No. 5473 was for 52,000 adapters at the unit cost of 25¢ and at a total cost of $13,000; Purchase Order No. 40130 was for 300,000 at the unit price of 28¢ and at a total cost of $84,000; and Purchase Order No. 40131 was for 302,500 at the unit price of 28¢ and at a total cost of $84,700. Hoffman was to furnish the forging and Rumsey the tooling.

The original complaint contained eight causes of action. Each alleged cause numbered 1, 2, 3 and 4 demands judgment in the sum of $9,225.12, and each relates to Purchase Order No. 5473. Recovery on any one of these counts would bar recovery on the others. Each alleged cause of action numbered 5, 6, 7 and 8 demands judgment in the sum of $126,153.35, and all relate to Purchase Orders Nos. 40130 and 40131. Recovery on any one of these causes of action would bar recovery on the others.

This action was commenced in Supreme Court of New York State and was removed by order of that court to the U. S. District Court for the Western District of New York. Defendant answered on April 2, 1948. On February 27, 1948, plaintiffs served an amended complaint setting up an added Ninth cause.

The Ninth cause of action is said to be for "expended and incurred settlement expenses and/or continuing costs relating to the terminated portion of the purchase orders". Defendant's amended answer, which was served on May 9, 1948, contains a denial of all of the allegations for damages in the complaint and further alleges that the plaintiff Rumsey is not a proper party plaintiff.

Trial was commenced on April 2, 1948, and concluded June 10, 1948. Thirteen days were consumed in the trial. Eighteen hundred and one pages of testimony were taken; 122 exhibits introduced and 5 briefs received.

Informed of the chaotic conditions in settlement of war contracts following World War I and anticipating the early conclusion of World War II, Congress passed and there became law the Contract Settlement Act, hereinafter called Act 41 U.S.C.A. § 101 et seq. This Act was purposed to and did set up a procedure by which settlement of terminated war contracts might be speedily determined with just compensation to the contractors. To supplement this Act, many regulations, having the force of law, were set up. The Act in detail points its objectives and methods by which they are to be obtained. These may well be quoted, in part.

"Sec. 1 * * *

"(a) to facilitate maximum war production during the war, and to expedite reconversion from war production to civilian production as war conditions permit;

"(b) to assure prime contractors and subcontractors, small and large, speedy and equitable final settlement of claims under terminated war contracts, and adequate interim financing until such final settlement;

"(c) to assure uniformity among Government agencies in basic policies and administration with respect to such termination settlements and interim financing;

*   *   *   *   *   *

"(e) to assure the expeditious removal from the plants of prime contracts and subcontractors of termination inventory not to be retained or sold by the contractor; * * *"

The plaintiffs here sue to obtain relief afforded by the common law as well as re-

lief afforded by the Act. Is this permissible? Admittedly this is a case of first impressions.

■ The plaintiffs had the right to sue at common law. This is not controverted by the defendant, and this right is confirmed by certain provisions of the Act, regulations adopted pursuant to the Act, by decisions of the courts, by declarations of law makers in consideration in Congress of the measure. Stevens v. Federal Cartridge Corporation, 226 Minn. 148, 32 N.W. 2d 312, impliedly held that such action might be brought at common law, since the decision denied plaintiff relief because it had not filed with the Navy the form required. In Kal Machine Works, Inc. v. United States and Precision Metal & Machine Co. v. United States, 3 CCF 1001 and 1002, the Appeal Board said the contractor had the right of election. The appeals in these cases to the Court of Claims, reported in 68 F.Supp. 436, 107 Ct.Cl. 202, and 68 F.Supp. 437, 107 Ct.Cl. 219, show no consideration of this question. In discussion of the proposed Act in the United States Senate on May 4, 1944, the inquiry was made as to whether the proposed Act provided any method by which subcontractor could force the government to recognize him if he felt the prime contractor was not treating him fairly, and the reply by the introducer of the measure was that: "He can go into court. He can go into court only against the prime contractor." 3386–3397 Congressional Record.

■ Whether recovery is had under the common law or the Act, plaintiffs are entitled to recover their loss by reason of the cancellation of the orders. The difference in effect lies in the fact that each sets up a different method for the fixation of damages—one under the formula of the Act, the other as for breach of contract.

In May and June, 1945, Rumsey had been engaged in preparing its tools for use. It was engaged in the actual tooling of the adapters less than three months. At the time of the final termination, it had on hand in its plant a large amount of tools, material and equipment. It was obliged to re-

move and store this in its plant. The space these materials required when removed shows something of the quantity of materials. This was 9784 square feet. Whether or not Rumsey observed the provisions of Section 112, Title 41 U.S.C.A., does not appear. That section states the policy of the government to be, upon termination of war contracts, to assume the expeditious removal of materials from the plants. It provides that the contractor may submit a statement showing the materials claimed at the termination and his desire to have them removed by the government. This section further provides that the government agency shall arrange for the storage by the war contractor on his premises or elsewhere, or shall remove the government's materials from contractor's plant. It does appear that no date of plant clearance was ever officially set. It does appear that from time to time Rumsey requested directions for the disposition of these materials, but it was not until May, 1946, that the first carload was sold by the Navy Supply officer and not until the following month that the materials were all removed.

Intervening the submission of the first proposed settlement presented by Rumsey and the time of the commencement of this suit, there were frequent conferences between Rumsey and the Navy Department, and many compilations of figures made, as the record herein shows. The direct labor expense incurred by Rumsey, from July 1 to September 30, 1945, was $70,675.51; the indirect factory expense for the same period, $235,922.71; and for general and administrative expenses, $181,006.66. These included an almost innumerable number of items of charges, all totalling $487,615.88, as claimed by plaintiffs. At the termination only 6.7% of the orders had been completed.

As showing the unreliability of the computations of recommendations made by the Navy cost inspector, plaintiffs point to eight different reports recommending for acceptance amounts ranging from $27,093.30 to $115,816.39. As to this last amount the plaintiffs are in error in claiming that the inspector recommended any such amount

for acceptance. Plaintiff's counsel placed on the blackboard figures totalling that amount, and, in effect, asked the inspector if the computation was correct. He was not asked whether he recommended that amount for acceptance. As to the other computations, they are easily explained. The first was made shortly after the settlement proposal of Rumsey was submitted, and in that it recommended for acceptance $27,093.30; $25,406.81 for further consideration and $82,622.73 for disallowance. Such disallowance included the item of $26,450.30 for "costs", called by Rumsey "momentum costs", and many charges for indirect factory expense and general and administrative expense which later admittedly were not proper charges. In August, 1945, Rumsey reduced every one of its original charges, altogether in the amount of $33,107.58. Later it made other reductions. The inspector made his reports on differing bases, such as on a loss contract, an inventory, a profit contract. Also the earlier computations were based on a different operation period than Rumsey. This resulted in a different burden or overhead rate. Obviously, the burden rate was also changed by the disallowance of items charged. Two of the reports cited, B–1 and C–1, are not in evidence.

The following tabulations show the charges made by Rumsey in its original proposal and its later adjusted proposal, and two reports made by the inspector:

Rumsey's proposed settlement of January, 1946, contains these charges (Plaintiffs' Ex. 28):

| | |
|---|---|
| Direct Labor | $ 15,444.55 |
| Indirect factory expense | 51,557.00 |
| Dies, jigs, fixtures, special tools | 3,258.96 |
| Other costs | 26,450.30 |
| General & administrative expenses | 39,554.04 |
| Total | 136,264.85 |
| Profit | 11,032.99 |
| Total | 147,297.84 |
| Deduct-Finished product invoiced or to be invoiced | 12,175.00 |
| Total | 135,122.84 |
| Settlements with subcontractors | 254.03 |
| Total | $135,376.87 |

On August 9, 1946, Rumsey submitted what it calls an "Adjusted Proposal", as follows (Plaintiffs' Ex. 30):

| | |
|---|---|
| Direct Material | 343.00 |
| Direct Labor | 13,753.26 |
| Indirect Factory Expense | 45,911.13 |
| Dies, Jigs, Fixtures & Special tools | 1,760.32 |
| Other Costs | 18,180.94 |
| General Administrative Expense | 23,699.66 |
| Total | $103,648.31 |
| Profit | 8,598.27 |
| Total | 112,246.58 |
| Finished Product Invoiced | 12,175.00 |
| Total | 100,071.58 |
| Settlements with Subcontractors | 254.53 |
| Allowance for Interest | 1,944.68 |
| Total | $102,270.79 |

The inspector's report of July, 1946, recommended for settlement (Plaintiffs' Ex. 29):

| | | |
|---|---|---|
| Direct Labor | $10,554.24 | For Non-Acceptance |
| Indirect factory expense | 21,153.86 | |
| Dies, jigs, fixtures and special tools | 1,760.32 | |
| Other costs | 515.37 | |
| General Administrative expenses | 5,284.51 | |
| less* | | |
| Finished product invoiced | 12,175.00* | |
| Total | $27,093.30 | $82,622.73 |

The inspector's report of February 10, 1947, recommended for payment (Plaintiffs' Ex. 61):

| | |
|---|---|
| Direct Labor | $13,753.26 |
| Indirect Factory | 41,939.19 |
| Dies, jigs, fixtures & spec. tools | 1,760.32 |
| Other costs | 515.37 |
| Gen. & Adm. Exp. | 13,116.48 |
| Settlement Exp. | 15,000.00 |
| Total | $86,084.62 |

The burden or overhead rate is the proportion which the direct labor costs bear to indirect factory expense and also to general and administrative costs. This rate as used in arriving at these costs differs, as between the parties, quite widely. This is caused by the difference in the total of the items allowed. In its first proposal Rumsey followed a formula by which it determined its momentum costs on the relationship of the dollar value of each order to the

total value of all. The total dollar value of Purchase Order No. 5473 was $13,000, as claimed by Rumsey, and the total of the purchase orders was $181,006.66. The direct labor cost $13,000 is 7.15% of $181,006.-66. Taking 7.15% out of 100% leaves 92.-25% which Rumsey allocated to the other two purchase orders. The inspector, as he claims, found the burden rate from the actual experience of Rumsey from the time cards. The formula used by Rumsey makes no provision for progress performance. The costs would be the same no matter how many units were produced in a certain period of time.

The item $343, for direct material is allowed.

The direct labor charge of $15,444.55 is allowed at the amount of the original claim, less certain charges which were disallowed as charges for direct labor and transferred to indirect labor charges, or $13,375.26.

Computed on a burden rate of 333.82%, as determined by Rumsey, the indirect factory expense would be $45,911.13. The inspector used a burden rate of 304.94% in computing that expense, and this resulted in total of $41,939.19 for that. In Rumsey's first proposal, the charge for indirect factory expense was $51,557. In arriving at total of $41,939.19 by the inspector, it is evident that he recommended for non-acceptance certain direct labor charges of $5,-645.87 and certain direct labor of $3,971.94. It is believed that the inspector's computation is correct and the claim for indirect factory expense is allowed at $41,939.19.

The charge of $1,760.32 for dies, jigs, etc. is allowed.

In computing the amount of general and administrative expenses, we find wide difference in the burden rates as used by the parties. Rumsey's burden rate was 256.-11% in its original computation, but this was reduced to 153.45% in its adjusted proposal. The inspector's rate was 95.37%. This difference results from the non-acceptance of $113,602.14 of Rumsey's claim for administrative charges, together with the fact that the period used by Rumsey and the inspector to establish overhead rates differed, one being from July 1 to September 30, 1945, and the other from May 1 to September 30, 1945. In the adjusted proposal Rumsey deleted charge for experience and development, $30,005; bad debts, $20,125.19; selling expense, $15,115; and financing fees, $7,309.29. The original charge for general and administrative expenses was $39,554.04. This was reduced to $23,699.66. The cost inspector recommended $13,116.48.

The general and administrative items of charges include many which are not allowable and were not allowed by the cost inspector. The larger items not acceptable are for salaries, legal fees, telephone and telegraph, travel expenses, automobile operation, general expense, experiment and development, bad debts, fiscal fees and selling expense. As to the charge for accountants' fees, it is to be said that this had been charged in other related settlement proposals. Rumsey was working on subcontracts for Packard and Chrysler and Baldwin Locomotive during most of the period that Rumsey was operating under Hoffman. The travel expense has been reduced 75% because this was used by Rumsey's auditor in determining the rate applicable to work performed under another terminated subcontract. A fifth percent of the automobile charges only was acceptable to the inspector, because that was the amount charged in the proposed Packard settlement. The general and administrative expense, as submitted, contained a contingent amount of $10,000, and obviously this was not allowable. The fiscal fees were on account of services in procuring a loan in 1941, and the inspector allowed a proportionate charge, or one-fifth, inclusive. Other items including experiment and development have been withdrawn by the plaintiffs, aggregating $45,-000.

It is not possible for the court to arrive at exact amount allowable for this type of expense because it appears many items can not be properly charged as expense and were not directly traceable to items charged on the books. It is allowed at $18,190.

The item of profit will be allowed in the amount of 10% on all sums allowed herein, excepting on such profit.

In the first settlement proposal, item of "other costs" was referred to by Rumsey as "momentum costs." "Momentum costs" is not known to the Joint Termination Regulations though the term is used by certain tax services. It is defined by plaintiffs as a charge to replace settlement costs up to the time of the submission of the settlement proposal. The item of charges of "other costs" in the first proposal was $26,-450.30; in the adjusted proposal the charge is $18,180.94. The cost inspector accepted $15,000 as a "settlement expense" in the place of or on account of the claim for "other costs." The $18,180.94 seems to have been largely made up of a storage charge of $10,704.84; salaries of employees, $6,664; certain payroll taxes and insurance and photostating.

Section 112 of the Act, 41 U.S.C.A., states the policy of the Government on the termination of a war contract to be "to assure the expeditious removal from the plants * * * of the termination inventory not to be retained or sold by the war contractor." That section provides that the war contractor furnish a statement showing the materials which he claims to be termination inventory; that within sixty days after the submission of such inventory the Government agency shall provide for disposition of the inventory, unless a longer period is agreed upon; that no contracting agency shall postpone or delay any termination settlement beyond the period fixed as aforesaid. It does appear that no date for plant clearance was ever officially set. The final removal was not till May, 1946. However, none of the rights of the parties for failure to observe Section 112 are affected. The parties kept on negotiating for a settlement down to August 1, 1947, when there was the adjudication in bankruptcy. The plaintiffs' charge is for the removal and storage from September 21, 1945, to May, 23, 1946, while the inspector allows storage for sixty days, from January 24, 1946. Plaintiffs claim the storage space required was 9784 square feet. The inspector says 3636 square feet. Plaintiffs claim $10,704.48 for this item. (It appears that Rumsey did not segregate on its books directly costs allocable to termination expenses.) Included in the "cost" item is a charge of $5,906.40 for salaries which are itemized, making a total of $16,610.88. Rumsey's "Adjusted Proposal" was $18,088. The original "Cost" charge was $26,450.30. An award of $15,000 is ample for services performed and expenses incurred to January 24, 1946, and an award of $3,189.10 for services and expenses in connection with settlement efforts to August 9, 1946, is sufficient.

There is evidence offered by the plaintiffs that under the Act the plaintiffs are entitled to recover $135,376.87, not including costs incident to the trial. Obviously that is incorrect since large items have admittedly been withdrawn, and the "Adjusted Proposal" is $102,270.79.

Plaintiffs seek to recover a total of $91,-196.81 for what are properly called "settlement costs". This is made up of $26,450 prior to January 24, 1946, $16,501, from that date to August 9, 1946, $48,245.81 to the conclusion of the trial, and profits $10,000. It will be seen that the total of all charges is approximately the same as the total prices of the three contracts.

The total charges after the first proposed settlement of Rumsey include $64,947.39 for services and expenses of officers of the company, attorney's charge and an accountant's charge of $2,650 and photostating $350, all incident to the trial of the action. This does not include any profit charge.

In the Court's opinion, the plaintiffs are not entitled to recover any amount for charges subsequent to August 9, 1946. This would be so if damages were assessed under the provisions of the Act. The plaintiffs are entitled to recover the reasonable value of the services performed, necessary expenses incurred and the profits which it can be said they would have obtained had the contracts been completed. It is conceded that there is nothing in the Act which directly recognizes the right to obtain the relief afforded by the common law and at the same time the right to obtain relief afforded by the Act. The purpose of the Act was to provide for "appropriate administrative determination." It required settlement "by agreement to the maximum extent

feasible." Sec. 106(e). If this is not effected, settlement may be made by administrative determination. Sec. 107 is entitled "Settlement of subcontractors' claims— Conclusiveness of settlement". This contained no provision for allowable costs. Sec. 113(b)(2) provides for suits against a corporation "in any court of competent jurisdiction in accordance with existing law." The costs allowable under Title 28 U.S.C.A. § 1920, do not include any of the items listed in 106(d)(3) of the Act.

■ There is no indication in the Act to extend the meaning of the term "settlement" to include a settlement resulting from an action at law. The words of Sec. 106(d)(3) are "incident to termination and settlement of the terminated war contract". The Act declares Sec. 103(d) "The terms 'termination', 'terminate', and 'terminated' refer to the termination or cancellation, in whole or in part, of work under a prime contract * * * or of work under a subcontract for any reason except the default of the subcontractor." While the term "settlement" is not defined in the Act, it is used only in connection with a settlement by agreement and an administrative determination without such agreement. The language of Sec. 106(e) and 113(b) seems to exclude any further extension of the term.

■ The intent of the law makers is definitely shown in the consideration in Congress of the measure which ripened into the Act. In the discussion before the Judiciary Committee of the House of Representatives, the introducer in answer to a question said: "I was trying to write it so that the man who starts litigation would pay for it out of his own pocket." Judiciary Committee, H. R. May 17, 1944. Quoting further from such minutes we note further: "Mr. Kafauver. On page 8, section 6(a), just a clarification. It provides that the Government shall pay the contractor reasonable cost incurred by the contractor in connection with the termination and settlement. That means attorney's fees, auditor's fees, and trips to Washington (many are included in this suit)? Mr. Hancock: No sir; that has been sharply

defined, but it has only been aimed at the normal expenses of business as will be a part of the general overhead. Normal procedure allows a man to cover only expenses of the preparation of his claim and the prosecuting of it." On December 21, 1946, the officers and directors of Rumsey "decided to reject the Navy offer of direct settlement but to encourage informal negotiations with the Navy". By bringing suit and by this action of the officers and directors Rumsey waived its right to any recovery under the Act.

The record of the conference between officers and directors on December 21, 1946, also reads in part: "In view of the fact that Navy audit recommended only $27,-000.00 for allowance, General Counsel advised us that we would be subjecting ourselves to possible unilateral determination for that amount instead of the $135,000.00 which we believed to be due."

This present claim of $135,376.87, as set out in the original complaint, included $26,-450.30 "costs", and that item of "costs" included no accounting or legal expenses. So far as the record shows, no claim, such as here for legal services and other expenses in connection with the suit herein, was made for upwards of a year after suit was brought. Counsel on December 21, 1946, evidently did not sense any liability of defendant for trial costs and expenses.

The Act states, as hereinbefore shown, that one of its purposes was "to assure to prime contractors and subcontractors, * * * speedy and equitable final settlement of claims * * *." Sec. 1(b) and Sec. 6(a). No such result has been obtained here. The delay may well be laid at the doors of both parties and the Navy department. Plaintiffs permitted delay in the joinder of issue. It could have forced a trial in a reasonable time after the action was brought. So could the defendant have so done.

Under the Act a war contractor may be allowed reimbursement for "reasonable accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war contract;

* * *." Sec. 6(d)(3). The Director of the Advisory Board promulgated this regulation:

"551.2—Particular allowable costs.—

"(k) Settlement expenses.—Reasonable accounting, legal, clerical and other expenses necessary in connection with the termination and settlement of the contract and subcontracts and purchase orders thereunder, including expenses incurred for the purpose of obtaining payment from the Government only to the extent reasonably necessary for the preparation and presentation of settlement proposals and cost evidence in connection therewith."

Termination Cost Memorandum No. 11, as amended March 30, 1946, provides:

"2. Definitions.—a. The costs and expenses covered by subparagraphs 1(k) and (l) of the Statement of Cost Principles include such items as are incident to effecting terminations, termination settlements * * *. They do not include: (1) the cost of * * * (2) accounting, legal and clerical, and other costs and expenses incurred by * * * a subcontractor in any formal appeal or submission * * * or suit in court, where such proceeding is instituted by such contractor for the purpose of obtaining payment in excess of the settlement amount determined to be due by the Government * * *."

In view of the foregoing provisions in the Regulation and Cost Memorandum, it seems clear that the relief sought here under the Act cannot be had.

The question here has not been directly decided by any Court of the trial level of this Court. Stevens v. Federal Cartridge Corp., 226 Minn. 148, 32 N.W.2d 312, was an action by a subcontractor against a subcontractor. The lower court was affirmed. The only matter decided was that it was mandatory that the subcontractor file its claim against the prime contractors on the form prescribed by the regulations adopted under the Act. In this case the question arose on a demurrer to defendant's answer. This case is important here in what the opinion says regarding legislative intent. It cites Macauley v. Waterman S. S. Corp., 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839, wherein it was said that the Supreme Court will look to ascertain the legislative intent.

In the Preliminary Hearing in G. I. Hanson, doing business as Star Engineering Co. v. War Department, Proceeding No. 44, decided July 9, 1946, a claim was filed for $11,043.45 for post termination expenses. The contracting officer allowed $2,455.03 for these expenses. Hanson asked for $1,500 for attorneys' fees and $612.22 for expenses in connection with the appeal. The Appeal Board in its preliminary hearing said: "No allowance may be made for attorneys' fees and expenses of witnesses incurred in connection with this appeal." Later the Appeal Board modified its former decision by increasing the total award to $6,667.27. A final decision by the Board affirmed, but made no mention of attorneys' fees.

Curran Chemical Arms Corp., B.C.A. No. 663, September 28, 1944, cited in 2 CCF 1119 at 1126, discloses facts quite comparable with those at bar in various respects. The Board, in part, said: "The Board is of the opinion as to these items of expense, that only the following amounts are properly chargeable to the expense of termination; namely, $750 for executive salaries, $175 for rent, $136.52 for heat, $83.25 for light and power, and $100 for janitor service." The termination period was two months. The termination expenses, as then claimed included attorneys' fees. The Board further said: "The appellant subsequent to the hearing of this appeal has submitted to the Board 'invoices of public accountants and attorneys for services rendered in connection with the above Board of Contract Appeals case' in the total amount of $3,850.50. Although these items of expense have not been submitted to the Contracting officer for his consideration, the Board is of the opinion that they are not incurred by the appellant subsequently to the date of the formula settlement and are more in the nature of expenses incident to litigation against the Government." The appellant, Curran Chemical Arms Corp., later allowed $950 for attorneys' fees. This allowance was made on a request by letter that the Board reconsider its opinion "relative to remuner-

ation paid by appellant for services rendered by attorneys in connection with the negotiation of a settlement between the appellant and the Government after the termination of the contract and prior to the appeal filed by the appellant." The $950 was allowed for attorneys' fees "after the termination of the appellant's contract and prior to its appeal." Bringing suit has the same effect here as an appeal under the Act. While there has been no formula settlement, Rumsey refused to proceed under the Act.

In The Electric Sprayit Company v. War Department, Submission of Harold et al. v. The Electric Sprayit Company, decided April 28, 1947, Proceedings 88 and 90, Sprayit Company was the prime contractor, Illinois Metal Products Company, the subcontractor. The Appeal Board on a re-hearing allowed Sprayit $195 and Illinois $345 as legal fees up to the time of the denial by Sprayit of Illinois' claim for settlement expenses. The Board, in part, said: "Illinois Metal is entitled to expenses reasonably incurred in the preparation and presentation of its claim prior to determination of the amount of settlement by Electric Sprayit; * * *. Illinois Metal's efforts to obtain reconsideration of its case after May 10th did not result in a new determination, and the expenses of such negotiations are therefore not allowable settlement expenses."

Kal Machine Works, Inc., v. United States, 68 F.Supp. 436, 107 Ct.Cl. 202, held that except for Contract Settlement Act a subcontractor whose contract was cancelled after the United States cancelled contract with contractor had no right of action against the United States for want of privity. Here the United States did not accept responsibility for settlement of claim but denied responsibility by virtue of disapproval by Award Board of Chicago Ord. Dist. of settlement between subcontractor and negotiator for district.

Precision Metal & Machine Co. v. United States, 68 F.Supp. 437, 107 Ct.Cl. 219, held that United States was not liable for damages incident to contractor's cancellation of contract with subcontractor after United States cancelled contract with contractor, notwithstanding Award Board of Chicago Ord. Dist. approved settlement between subcontractor and negotiator where settlement provided not that government would pay claim but that prime contractor would be authorized to do so. Further, it held that to establish liability of United States for damages to subcontractor, United States must not only agree with subcontractor on amount which should be paid in settlement of claim but must also agree to pay such amount.

In Piggly Wiggly Corp. v. The United States, 112 Ct.Cl. 391, it was said: "In view of the general rule that attorneys fees are not allowed in suits against the United States in the absence of an express statutory provision allowing them, we are disposed to agree with defendant's interpretation of the Contract Settlement Act. It is clear from the statute that the contracting agency must include any such fees incurred in connection with termination negotiations with it. It is not at all clear that section 6(d) applies to this court or to the Appeal Board with respect to any expenses arising after the final determination has been made by the terminating agency."

■ Such is the administrative construction, and that is to be given weight. Many other courts have so held. See: Wisconsin v. Illinois, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426; Mountain States Power Co. v. Public Service Comm., 299 U.S. 167, 57 S.Ct. 168, 81 L.Ed. 99; United States v. Acme Operating Corp., 288 U.S. 243, 53 S.Ct. 332, 77 L.Ed. 725.

■ Special significance here is the showing of the intent and construction of this Act when considered in Congress. It is well established that where ambiguity exists resort may be had to the history of an Act and of the proceeding attending its passage. The cases are legion. Macauley S. S. Corp., supra; Hale v. Iowa State Board, 302 U.S. 95, 58 S.Ct. 102, 82 L.Ed. 72; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195.

The plaintiffs now mainly base their position on certain provisions appearing on the reverse side of the purchase orders. These are:

"1. Acceptance of this order by the seller or his agents constitutes acceptance of all conditions stated herein. * * *

"8. This purchase order is subject to all applicable rules, regulations and orders covering termination of the above designated direct or indirect government contract."

Item 8 is not susceptible of the construction placed upon it by the plaintiffs. The terms of the Act are not incorporated in the order. It was intended to apply only when the contractor took proceedings under the Act. Evidently Rumsey did not construe Item 8 as having any application when this suit was brought.

■ As has been pointed out, Item 8 does not in and of itself make the determination of damages subject to the Act. That would be true only if the terms of the Act were incorporated in the contract as the agreement. It would have the effect claimed by the plaintiffs, else a subcontractor may assert a claim under the Act only if the Navy Department accepted liability in a suit against the United States.

Plaintiffs cite numerous cases with the purpose to show that the damages in this case are "liquidated". Whether or not they are is not material since under this decision recovery is not allowed under the Act. It may be noted that in all of the relevant cases cited by plaintiffs on this point save one, the contracts specifically provided for liquidated damages on default. United States v. Walkof, 2 Cir., 144 F.2d 75, 154 A.L.R. 1250, affirming In re Lion Overall Co., D.C., 55 F.Supp. 789; Acme Mills Inc., v. Tanner-Brice Co., 5 Cir., 112 F.2d 910; Callanan Road Improvement Co. v. Colonial Sand & Stone Co., 190 Misc. 418, 72 N.Y.S.2d 194.

■ Exhibits 26, 27 and 28 of the plaintiffs are settlement proposals of January, 1946. The defendant objected strenuously to the reception of any of these in evidence as self-serving declarations. They were received subject to the proper connection being made. They were made fully competent by subsequent proof. It is true that the defendant was required to make proof both as to liability under the Act and outside of the Act. This was because the court did not during the trial want to pass on the question of whether plaintiffs could sue at law and measure their damages under the Act.

■ The first and second separate defenses set forth in the amended answer raise the question.as to whether an assignor of a chose in action has the right to maintain an action for the collection of such chose where the assignment was made as collateral security for a loan. The point has not been raised in defendant's briefs and no merit in this defense is seen. On or about September 27, 1945, Rumsey assigned to the First National Bank of Waterloo, Waterloo, New York, acting for itself and as agent for other banks, all its rights to all moneys due and to become due from the three aforesaid purchase orders. It is well settled that the assignor may maintain such action. Brown v. New York Life Ins. Co., D.C., 22 F.Supp. 82; Frensdorf v. Stumpf, Sup., 30 N.Y.S.2d 211, and the numerous cases cited. In the instant case the assignees have presented their claims against Rumsey to the Bankruptcy Court, and the trustee is a party plaintiff here. The debt owing to the Bank was approximately $450,000 and claims asserted in this action and a similar action are approximately $800,000.

■ In the case at bar the plaintiffs are awarded damages in the amount of $107,616.58 and interest. The award of $107,616.58 is the total of the items allowed as hereinbefore set forth. The items included are: direct material unpaid, $343; direct labor, $13,375.26; indirect labor, $41,939.19; tools, jigs, etc., $1,760.32; Administrative and General Expenses, $18,190; settlement, $22,008.81; and profits, $10,000. Each of the items allowed is properly included as damages for the breach of contract by defendant.

The award is made on the Eighth alleged cause of action and is based on liability under the common law. Interest is from

September 21, 1945. The other alleged causes of action are dismissed.

■ Plaintiffs have submitted evidence designed to show the expenses incurred and attorneys' fees in connection with the trial of this suit. The question of the value of the services and amount of expenses is not considered by the court. The court holds that the trial expenses are not allowable in this action. Plaintiffs are entitled to taxable costs.

■ In 20 C.J.S., Costs, § 218, p. 455, it is said:

"Outside of exceptional cases in courts of equity, attorney's fees are allowable or taxable as costs only by virtue of express authority conferred by statute, agreement, or stipulation."

"The general rule, subject to some exceptions * * *, requires each party to the litigation to pay his own counsel fees." New York Cent. & H. R. R. Co. v. Bank of Holly Springs, C.C., 195 F. 456, 461.

The court there quotes this language of Swayne, J., in Oelrichs v. Spain, 15 Wall. 211, 231, 21 L.Ed. 43: "We think the principle of disallowance rests upon a solid foundation, and that the opposite rule is forbidden by the analogies of law and sound public policy."

It is assumed that the Bankruptcy Court will have authority to make an allowance to counsel for the trustee for services in this proceeding and the estate of bankrupt will be liable for payment of services prior to bankruptcy.

Findings may be submitted.

Findings of Fact and Conclusions of Law.

This action having duly come on to be heard before this Court without a jury, and thereupon, upon consideration thereof, and the evidence adduced on the trial thereof, the Court hereby makes the following Findings of Fact and Conclusions of Law:

## Findings of Fact

In May, 1945, the defendant placed Purchase Order No. 5473 with the plaintiff corporation for the machining of 52,000 adapters, at a price of 25 cents each, or a total price of $13,000; in June, 1945, the defendant placed Purchase Orders Nos. 40130 and 40131 with the plaintiff corporation for the machining of 602,500 adapters, at a price of 28 cents each, or a total price of $174,500; the aggregate number of adapters thus being 654,500, and the aggregate price being $187,500.

2. Plaintiff corporation was a subcontractor of defendant, which in turn was a prime contractor with the Navy Department of the United States.

3. Said purchase orders were for war materials and subject to the terms and conditions of the prime contract relating to termination for the convenience of the Government.

4. Said Purchase Order No. 5473 was cancelled for the convenience of the Government on August 20, 1945, and Purchase Orders Nos. 40130 and 40131 were cancelled for the convenience of the Government on September 21, 1945.

5. At the time of the termination of Purchase Order No. 5473, 5300 adapters were shipped and the sum of $1325 was paid by defendant and received by plaintiff corporation against the contract price leaving the balance of the order unfinished and not completed.

a. At the time of the cancellation of Purchase Orders Nos. 40130 and 40131, 34,000 adapters were completed and shipped; and 4,750 adapters were completed and on hand on Purchase Order No. 40130; and the sum of $10,850 was paid by the defendant and received by the plaintiff corporation against the contract price leaving the balance of said order unfinished and not completed.

b. At the time of said cancellation, no adapters had been completed or shipped on Purchase Order No. 40131.

6. After notice of termination, plaintiff corporation promptly gave notice of its intent to file a claim for damages by reason of said cancellation, and on January 24, 1946, filed its claim against the defendant for $135,376.87.

7. Said claim was later subdivided into two claims, viz.: $9,225.12 as to Purchase Order No. 5473 and $125,153.27 as to Purchase Order No. 40130 and No. 40131,

which claims were transmitted to the Navy Department in June, 1946.

8. In July, 1946, the Navy Cost Inspector submitted to the plaintiff corporation written recommendations respecting the claim or settlement proposal.

9. In August, 1946, plaintiff corporation submitted to defendant a modified statement of its claim totalling $102,270.79.

10. This action was commenced on December 8, 1946, after numerous conferences between the parties and representatives of the Navy had failed to bring about a settlement.

11. On July 18, 1947, an involuntary petition in Bankruptcy was filed against the plaintiff corporation and on August 6, 1947, it was adjudicated bankrupt.

12. Plaintiff McAvoy herein was duly appointed and is acting as trustee of the bankrupt estate, and was by order of this court joined as a party plaintiff.

13. In May and June, 1945, plaintiff corporation had been engaged in preparing its tools for use and was engaged in the actual tooling less than three months.

14. At the time of final termination, plaintiff corporation had on hand in its plant a large amount of tools, material and equipment allocated to the said purchase orders, which it was obliged to remove and store in its plant and which required 9,784 square feet.

15. It was not until June, 1946, that the materials were all removed from plaintiff corporation's plant by direction of the Navy.

16. The direct labor expense incurred by plaintiff corporation from July 1 to September 30, 1945, was $70,675.51, the indirect factory expense for the same period was $235,932.71, general and administrative expense was $181,006.66; the foregoing, including almost innumerable items of charges, all totalling $487,614.88.

17. At the date of final termination, only 6.7 percent of said purchase orders had been completed.

18. The plaintiff corporation made or incurred the following expenditures: $343.00 for direct material, $13,753.26, as adjusted, for direct labor, $41,939.19 for indirect factory expense, $1,760.32 for dies, jigs and fixtures, and $18,190.00 for general and administrative expense prior to the final termination date of said purchase orders and properly allocable thereto.

19. The profits which the plaintiff corporation would have realized had the purchase orders not been terminated would have been the sum of $10,000.

20. Settlement expense of $18,189.10, as adjusted, was incurred or expended in the period between September 21, 1945, and August 9, 1946, by the plaintiff corporation.

21. Plaintiff corporation did not follow the administrative procedure for the settlement of terminated war contracts provided for in the Contract Settlement Act of 1944.

22. The defendant corporation should be given a credit of $12,175.00 for money paid on account of the contracts alleged herein on any amount found by the Court as damages herein.

## Conclusions of Law

1. Plaintiffs are not entitled to recover any amount for settlement expenses incurred subsequent to August 9, 1946.

2. Plaintiffs are not entitled to recover under causes of action First through Seventh.

3. Plaintiffs have the right to sue and recover damages for breach of contract under the common law.

4. The plaintiffs are entitled to recover the reasonable value of the services performed, necessary expenses incurred and the profits which it can be said plaintiff corporation would have obtained had the contracts been completed.

5. The term "settlement" as used in the Contract Settlement Act of 1944 does not include a settlement resulting from an action at law.

6. Plaintiffs are not entitled to recover damages against the defendant under the Ninth cause of action.

7. The plaintiff corporation as assignor of its claim against the defendant under a collateral assignment had the right to maintain suit against the defendant.

8. Plaintiffs are entitled to recover damages against the defendant under the Eighth cause of action as follows: Direct labor $13,753.26, direct material unpaid $343.00, indirect labor $41,939.19, tools, jigs, etc. $1,760.32, administrative & general expenses $18,190.00, settlement expenses $18,189.10 and profits $10,000.00, less $12,175.00, heretofore paid, making a total of $91,999.87, together with interest on the $10,000, the profit allowed herein, from January 27, 1946, interest on $18,189.10, settlement expense, as allowed herein, from August 9, 1946, and interest on $63,810.77 from September 21, 1945, and the taxable costs and disbursements in the action.

Let judgment be entered accordingly.