## BUFFALO UNION FURNACE CO. v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.

(Circuit Court of Appeals, Second Circuit. June 4, 1923.)

No. 103.

1. **Appeal and error ☞859—Facts not reviewed on writ of error.**
   On writ of error the Circuit Court of Appeals does not review the facts.

2. **Shipping ☞3½, New, vol. 8A Key-No. Series—Purchase of pig iron by Fleet Corporation could be canceled at close of war.**
   A contract for the purchase of 1,250 tons of pig iron by the Emergency Fleet Corporation, made under authority of Urgent Deficiencies Act June 15, 1917, *held* subject to cancellation on January 3, 1919, without liability for profits lost on 395 tons thereof then remaining undelivered.

3. **United States ☞125—Emergency Fleet Corporation may sue and be sued, like private corporation.**
   The United States Shipping Board Emergency Fleet Corporation, organized under Act Sept. 7, 1916, § 11 (Comp. St. § 8146f), may sue and be sued, like any private corporation.

4. **Shipping ☞3½, New, vol. 8A Key-No. Series—Notice of cancellation of war contract need not refer to authority.**
   Notice of cancellation of war material contract by Emergency Fleet Corporation need not refer to the Act of June 15, 1917, authorizing cancellation.

In Error to the District Court of the United States for the Western District of New York.

Action by the Buffalo Union Furnace Company against the United States Shipping Board Emergency Fleet Corporation. Judgment dis-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

missing complaint on the merits (280 Fed. 751; 283 Fed. 673), and plaintiff brings error. Affirmed.

Pursuant to appropriate written stipulation, the cause was tried before the court without a jury.

Slee, O'Brien & Hellings, of Buffalo, N. Y. (Frederick C. Slee and Dana B. Hellings, both of Buffalo, N. Y., of counsel), for plaintiff in error.

Geoffrey Goldsmith, Asst. Counsel U. S. Shipping Board, of Washington, D. C. (Chauncey G. Parker, Gen. Counsel U. S. Shipping Board, of Newark, N. J., and William J. Donovan, U. S. Atty., of Buffalo, N. Y., of counsel), for defendant in error.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

MAYER, Circuit Judge. [1], The facts, as found below, so far as they affect decision, are not in dispute, and, in any event, on writ of error we do not review the facts. United States v. Benedict (C. C. A.) 280 Fed. 76, affirmed March 5, 1923, 43 Sup. Ct. 357, 67 L. Ed. ——; American Concrete Steel Co. v. Hart (C. C. A.) 285 Fed. 322. Those findings of fact upon which the main controversy between the parties is predicated really involve certain questions of law, as will appear infra, and, if these questions were rightly construed, then the findings of fact necessarily followed.

[2] The action brought by plaintiff, a New York corporation, is for damages for breach of contract, and the damages claimed are anticipated profits represented by the difference between contract price and cost of manufacture. The contract was entered into in June, 1918, and thus at a time when the United States was still at war, and after the enactment of the statutes infra.

[3] Defendant is a corporation organized on or about April 16, 1917, under the laws of the District of Columbia, in pursuance of section 11 of the Act of Congress entitled "An act to establish a United States Shipping Board," approved September 7, 1916 (Comp. St. § 8146f). Defendant may sue and be sued like any private corporation, and its legal status in such respect is discussed in and settled by Sloan Shipyards v. United States Shipping Board Emergency Fleet Corporation, 258 U. S. 549, 42 Sup. Ct. 386, 66 L. Ed. 762. On June 15, 1917, the Urgent Deficiences Act (quoted in part in the margin [1]) became law. 40 Stat. 182. Under authority conferred by

[1] "The President is hereby authorized and empowered, within the limits of the amounts herein authorized—

"(a) To place an order with any person for such ships or material as the necessities of the government, to be determined by the President, may require during the period of the war and which are of the nature, kind and quantity usually produced or capable of being produced by such person.

"(b) To modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material. * * *

"Compliance with all orders issued hereunder shall be obligatory on any person to whom such order is given. * * *

"Whenever the United States shall cancel, modify, suspend or requisition any contract, make use of, assume, occupy, requisition, acquire or take over

the·act, the President of the United States, by executive order dated June 11, 1917, designated defendant as his agent for the purposes of the act, so far as related to vessels, and, inter alia, clothed defendant with "all power and authority applicable to and in furtherance of the production, purchase, and requisitioning of materials for ship construction." The contract between the parties was developed by correspondence. Under date of June 12, 1918, Jasper, assistant purchasing officer of defendant, wrote plaintiff's agent:

"In accordance with the recommendation of the Director of Steel Supply of the War Industries Board, we are inclosing herewith our order P. D. 2507 covering 1,250 gross tons of pig iron to be shipped to the United States Shipping Board Emergency Fleet Corporation, care the American Condenser & Engineering Company, Plattsburg, N. Y. Kindly acknowledge promptly the receipt and acceptance of this order."

The inclosure was the purchase order, dated June 11, 1918, and addressed to plaintiff's agent:

"Please enter our order for the following material subject to all terms and conditions as contained herein: * * * Ship to U. S. Shipping Board Emergency Fleet Corporation, c/o American Condenser & Engineering Company, at Plattsburg, N. Y., per contract No. 1131."

The quantity was 1,250 gross tons pig iron, with certain ingredients which need not be set forth. The price was $33.50 per·gross ton, f. o. b. furnace plus freight to Plattsburg, N. Y. The order then continued:

"Deliver: 150 tons per month beginning June, 1918.

"Price: In accordance with ruling by the War Industries Board, the above price is effective for material shipped on or before June 30, 1918. For material to be shipped after June 30, 1918, the government price effective at the time such shipments are made shall apply.

"Freight: Prepay the freight and charge 'same to the Emergency Fleet Corporation. * * *

"Billing: Invoices should be rendered in quadruplicate to the General Auditor, Emergency Fleet Corporation. * * * One copy of each shipping notice shall be forwarded to the General Purchasing Officer, Emergency Fleet Corporation. * * * Also send one copy of each shipping notice to the Production Division, Emergency Fleet Corporation, * * * and one copy of each shipping notice, invoice, certificate of analysis, and bills of lading to American Condenser & Engineering Company, Plattsburg, N. Y.

"Acknowledgment: Kindly acknowledge promptly the receipt and acceptance of this order." ·

---

any plant or part thereof, or any ship, charter, or material, in accordance with the provisions hereof, it shall make just compensation therefor, to be determined by the President; and if the amount thereof, so determined by the President, is unsatisfactory to the person entitled to receive the same, such person shall be paid seventy-five per centum of the amount, so determined by the President and shall be entitled to sue the United States to recover such further sum as, added to said seventy-five per centum, will make up such amount as will be just compensation therefor, in the manner provided for by section twenty-four, paragraph twenty, and section one hundred and forty-five of the Judicial Code.

"The President may exercise the power and authority hereby vested in him, and expend the money herein and hereafter appropriated through such agency or agencies as he shall determine from time to time. * * *"

The order was acknowledged by plaintiff's agent under date of June 19, 1918, as follows:

"Replying to your favor of the 12th inst., with reference to order P. D. 2507, we inclose herewith acknowledgment of same, having placed the order at the furnace, and they will make shipment of the iron at your address, c/o American Condenser & Engineering Company, Plattsburg, N. Y., absolutely to the very best of their ability."

On January 3, 1919, defendant notified plaintiff to "suspend shipments and await further advice," and on January 30, 1919, defendant notified plaintiff to "cancel unshipped balance pig iron." At that time, plaintiff had manufactured and delivered all but 395.54 tons, and the profit in respect of this undelivered amount would have been $4,168.-99, to recover which, with interest, this action was brought.

It is first contended by defendant that the contract was made with defendant in its capacity as agent of the President, and thus with the condition of the statute, or with the power conferred by it, read into the contract; i. e., that defendant could at any time suspend or cancel the contract. There was evidence (as noted in the court's opinion, although not in the findings) that, when the pig iron was ordered, defendant had contractual relations with American Condenser Company to construct condensers for ships which were being constructed for defendant, and that title to such ships ultimately came to vest in the United States. There was also evidence that some of the pig iron was shipped by defendant to Robert Dollar Company, a concern engaged in shipping on the Pacific Ocean; but no finding was made nor requested to the effect that such shipment was for some private purpose, but, on the contrary, there was evidence that Robert Dollar Company was representing some persons in China "who were engaged in contractual relations with the Emergency Fleet Corporation."

In any event, on this record, the court was justified in expressing the view that the shipment in question did not "overcome the presumption that the pig iron for condensers was to be used for the purposes and necessities of the war. * * *" It is, of course, apparent that the contract did not, in so many words, notify plaintiff whether defendant was acting in its purely corporate capacity or as the agent of the President, yet it contains some indications that it was made in the latter capacity. Defendant was a war instrumentality. The Congress deemed the method of a private corporation desirable, and, in a practical way, the United States could thus deal with the building or obtaining of shipping facilities through this corporate device in a manner, according to the circumstances, which might fairly protect either the government or private interests, or both, as the case might be. At all times, however, it was apparent that, while this corporation was private in certain legal aspects, it was always public in its object and purposes, and in 1918 its activities were for war purposes.

This distinction has been recently pointed out in United States Grain Corporation v. Phillips, 43 Sup. Ct. 283, 67 L. Ed. ——, decided February 19, 1923, where Mr. Justice Holmes, who had previously written in the Sloan Shipyards Case, said of the U. S. Grain Corporation, an instrumentality in principle similar to that at bar:

"It is true that the legal title was in the Corporation, that the property of the Corporation might have been taken to pay a judgment against it, and that in other ways the difference of personality would be recognized. Sloan Shipyards Corporation v. United States Shipping Board Emergency Fleet Corporation, May 1, 1922. But for purposes like the present imponderables have weight. When, as here, the question is whether the property was clothed with such a public interest that the transportation of it no more could be charged for by a public officer than the carrying of a gun, we must look, not at the legal title only, but at the facts beneath forms."

When, therefore, the contract in the case at bar was made, plaintiff must be presumed to have known that it was for a public purpose, and particularly connected with the equipment of ships for war purposes. The words "per contract No. 1131" indicate fairly the existence of some contract in which defendant was interested. The language of the order dated June 11, 1918, and of the letter dated June 12, 1918, is not one of request, but rather of command, for the expression is "Kindly acknowledge promptly the receipt *and acceptance* of this order."

We refer to the foregoing because the case is one in which it is desirable that it be understood that the point has not been overlooked, but, as the question may arise hereafter in other circumstances where decision is necessary, we refrain from deciding, in the case at bar, whether or not the contract was made by defendant solely in its corporate capacity or in its capacity as agent of the President. Even though made in the former capacity, it is plain that the cancellation was in the latter capacity.

Every contract of the kind here concerned made after June 15, 1917, was made with the knowledge imputed by law that it could be canceled at the President's discretion, and every such contract made after July 11, 1917, was made with imputed knowledge that this power of the President could be exercised by defendant as his duly authorized agent. When, therefore, defendant canceled the contract, the situation was not analogous with some situations which occur in private contractual relations, where a private person seems to act for himself, when, in point of fact, he is agent for another, and where, therefore, questions as to undisclosed principal and the like may arise.

Here the power was at hand which could be lawfully exercised by defendant as the President's agent, and the right to "just compensation" was necessarily preserved to plaintiff. To treat defendant, however, as acting solely in its corporate capacity, would be to assume that it chose to break the contract rather than to act lawfully under the powers delegated to it by the President. If there be any assumption or presumption, it must be that defendant acted under its lawful powers as agent.

[4] The fact that no reference was made to the statute of 1917 in the cancellation notice is of no consequence, and in somewhat similar circumstances the contention has been set at rest by Russell Motor Car Co. v. United States, 43 Sup. Ct. 428, 67 L. Ed. ——, decided April 9, 1923. There Mr. Justice Sutherland said:

"In the first place, it is said that the President did not delegate his power respecting contracts to the Secretary of the Navy, and it is suggested that that officer did not in fact pretend to cancel this contract under the statute. The

order of the President delegating his authority to the Secretary is in sweeping terms, and it is impossible to conclude otherwise than that it was intended to cover the whole field of power in so far as it pertained to the Navy. Executive power, in the main, must of necessity be exercised by the President through the various departments. These departments constitute his peculiar and intimate agencies, and in devolving authority upon them meticulous precision of language is neither expected nor required. In canceling the contract it was not necessary that the statute should be expressly referred to. It was public law of which everyone was bound to take notice."

Even if the contract were regarded as a private contract, it would seem that there was power to cancel, for in the Russell Motor Car Co. Case the court also said:

"We do not mean to deny the power of Congress, in time of war, to authorize the President to modify private contracts (leaving the parties free, as between themselves, to accept or not), nor do we suggest that Congress has not done so by the present statute. * * *"

But we need not go so far. It is plain that the statute was intended to cover, in any event, those engagements into which the United States had entered, either directly through its departments of government, as in the Russell Motor Co. Case, or indirectly through instrumentalities such as defendant. Bearing in mind the principle of U. S. Grain Corporation v. Phillips, supra, we must realize that the power to cancel contracts was conferred in order to enable the President, in his discretion, to curtail, inter alia, government production, and therefore the contract here concerned was, for this purpose of the statute, as much of a government contract as if made direct by the government itself, and comes within the statutory provision as to cancellation, the purpose of which is thus stated in the Russell Motor Car Co. Case:

"In this connection it is not without significance that the authority granted to the President was to cease six months after the final treaty of peace. Obviously, the powers granted to him—among them to modify and cancel contracts—were to continue during the six months priod, not for the purpose of forwarding war production, but, on the contrary, for the purpose of stopping it. To that end, we conclude, he was authorized to cancel the government's own contracts, such as the one here involved, upon making just compensation to the parties concerned."

It follows, from what has been stated, that defendant was not guilty of a breach of contract and that the cancellation was not by defendant, but by the President acting through defendant as his agent. See, also, Meyer Scale & Hardware Co. v. United States, 57 Ct. Cl. 26, decided January 9, 1922, and Todd Dry Dock & Construction Corporation v. Sumner Iron Works (C. C. A. 9th Circuit) 289 Fed. 217. The action, therefore, should have been brought (as provided by the act of Congress) against the United States for "just compensation." Such actions, under other statutes, have already reached the courts. United States v. Pfitsch, 256 U. S. 547, 41 Sup. Ct. 569, 65 L. Ed. 1084; Seaboard Air Line Railway Co. et al. v. United States, 43 Sup. Ct. 354, 67 L. Ed. ——, decided March 5, 1923, and National City Bank v. United States (D. C.) 275 Fed. 855. But in such actions, as held in the Russell Motor Car Co. Case, anticipated profits will not be allowed.

Judgment affirmed.