**RUMSEY MFG. CORP. et al. v. UNITED STATES HOFFMAN MACHIN-ERY CORP.**

**No. 23, Docket 21678.**

United States Court of Appeals
Second Circuit.

Argued Oct. 31, 1950.

Decided March 29, 1951.

Albert Averbach, Seneca Falls, N. Y. for plaintiffs-respondents.

H. G. Morison, Asst. Atty. Gen., George L. Grobe, U. S. Atty., R. Norman Kirchgraber, Asst. U. S. Atty., Buffalo, N. Y. (Edward H. Hickey, Hubert H. Margolies, Attorneys, Department of Justice, Washington, D. C., of counsel), for defendant-appellant.

Before L. HAND, Chief Judge, and SWAN and FRANK, Circuit Judges.

L. HAND, Chief Judge.

Both parties appeal from a judgment awarding damages to the plaintiffs for the defendant's cancellation of a contract under which the Rumsey Company had promised to make and deliver to the defendant a large number of "adapters"—a small member of a naval projectile. The defendant had entered into a "prime contract" with the Navy to manufacture projectiles and placed three "Purchase Orders" with the Rumsey Company, all in the same form, the important words of which, for the purposes of this suit, were the following: "This purchase order is subject to all applicable rules, regulations and orders covering termination of the above designated direct or indirect government contract." The "findings of fact" in the court below all appear on pages 406 and 407 of the report of the opinion;[1] and we shall

1. Rumsey Manufacturing Corp. v. U. S. Hoffman Machinery Corp., D.C., 88 F.Supp. 394.

assume an acquaintance with them in what we have to say. The Navy cancelled the defendant's contract and the defendant cancelled the "purchase orders" after a small part of the "adapters" had been delivered; the action was to recover for the expense which had been incurred, and for the profits lost. The plaintiffs sued without invoking the procedure provided by the Contract Settlement Act of 1944;[2] and the most important questions upon the appeal are (1) whether a subcontractor under a "war contract" may sue the "prime contractor" at common law, disregarding the Act; and (2) if so, whether in that event the measure of recovery, as laid down in the Act, is in any degree available to it. To an answer some analysis of the Act itself is necessary. Section 6 provides for the settlement of "termination claims," which § 3(h) defines as claims of a "war contractor" "for the termination of any war contract". A "war contractor" includes a "subcontractor"—§ 3(c)—and "termination" includes any "work under a subcontract"—§ 3(d). When a claim either of a contractor or a subcontractor is not settled "by agreement," as § 6(c) permits, but by "determining fair compensation" under § 6(b), § 6(d) mentions seven items which shall be taken "into account," and four which shall not. Section 7 as a whole provides for the settlement of "subcontractors' claims," and § 7(a) makes any settlement of a contractor with his subcontractor "conclusive" against the "agency," in cases where the settlement has been "approved, ratified or authorized" by the "agency." If the "agency" does none of these things, § 7(d) gives it power to intervene in order directly to settle the claim of a subcontractor; but before doing so, not only must it "deliver to the subcontractor, and the war contractor liable to him, written notice stating its acceptance of responsibility for settling his claim," but it must also procure the subcontractor's "consent," whereupon "the Government shall become liable for the settlement of his claims." In the event of the failure of an "agency" and any "war contractor"— "prime" or subcontractor—to arrive at a settlement, § 13 sets up the procedure which shall be followed, but which is applicable only to cases where "the contracting agency" has become "responsible for settling any termination claim * * * by agreement". When § 13 does apply, the "agency" may file its findings, and must do so within ninety days if the "war contractor" demands that it shall. If the "war contractor" is not satisfied, he has the option of appealing to an "Appeal Board," or of suing in the Court of Claims or in a district court—§ 13(b). Section 13(c) sets out the procedure both before the Appeal Board or a court. Although nothing in § 13 prescribes the seven items which § 6(d) makes proper in measuring "fair compensation" under § 6(b) when an "agency" is settling a termination claim, resort to either the Appeal Board or to a court is a review of the action of the "agency," and it is reasonable to suppose that a court must as much follow § 6(d) as the Appeal Board must. At any rate we shall so assume, and it would follow that, if the action at bar was authorized by § 13(b)(2) the subcontractor would have been entitled to invoke the seven items of § 6(d), and would have been subject to the four limitations of that section.

It appears to us that the scheme or plan of the Act is reasonably apparent. It was of course to be expected that "prime contractors" would let out some of the work to subcontractors, that the accounts between the two would have to be settled, and that the "prime contractor" would wish whatever he paid the subcontractor to be credited to him in his own settlement with the "agency." Thus the "agency" had a lively interest in the "prime contractor's" settlement with his subcontractor, which § 7(a) recognized when it gave the "agency" power to "approve" the terms which the contractor was willing to tender to the subcontractor, or to "ratify" his settlement, if he had made one, or to "authorize" him to settle on his own terms if it thought him "reliable" enough. These courses the "agency" might take as be-

tween the contractor and itself; and they involved no action by it *vis-a-vis* the sub-contractor. However, it might happen that the subcontractor, although by hypothesis he had no contract with the "agency," was so unreasonable in his demands upon the "prime contractor" that he was blocking that speedy settlement which the Act was especially designed to promote. In that event the "agency" might intervene directly and "settle" the subcontractor's claim, though only in case it had been able to induce the subcontractor to consent by offering the liability of the United States. In that event § 13 would come into play and we may assume that, if that happened, the subcontractor might not sue the contractor. Be that as it may, in the absence of such an agreement the "agency" was not authorized to "settle" a subcontractor's claim at all, and there is no reason to suppose that the Act meant to put any limitations upon his action at common-law against the contractor. The only exception is that the regulations require all subcontractors promptly to file with "prime contractors" any claims they might have against them.[3]

In the case at bar the Rumsey Company refused to make any settlement agreement with the Navy, although the Navy offered to become "responsible" for settling the claim under § 7(d). The district judge in his opinion quotes from a "conference between officers and directors" of the Rumsey Company on December 21, 1946, in which it "decided to reject the Navy offer of direct settlement but to encourage informal negotiations". [88 Fed. Supp. 402.] The evidence of this conference we do not find in the record, but we assume that it must have occurred, since no one has disputed it; and the 21st finding is that the plaintiffs "did not follow the administrative procedure for the settlement of terminated war contracts provided for in the Contract Settlement Act of 1944." It follows that they were free to sue the defendant at common law in contract because of its cancellation, as the district judge decided, and as indeed the attorneys for the defendant apparently conceded in the district court; and it also follows that none of the provisions of the Act relating to the "settlement" or "determination" of "termination claims" applied to the action. It was a bare suit in contract to be decided throughout without regard to the Act. The decision of the Supreme Court of Minnesota[4] is not to the contrary; for, although some of the discussion goes further afield, the actual holding was no more than that before a subcontractor may sue a "prime contractor," he must file the claim provided for by the regulation we have just cited. The only other decision on which the defendant appears to rely is Monolith Portland Midwest Co. v. Reconstruction Finance Corporation, 9 Cir., 178 F.2d 854, and since it concerned an action by a "prime contractor" against an "agency," it is irrelevant. On the other hand, although the plaintiffs stand upon their rights at common law, the language which we quoted above from the "Purchase Orders" incorporated parts of the Act which for that reason entered into the obligations of the parties. Thus the case resolves itself into the meaning of the words: "subject to all applicable rules, regulations and orders covering termination of the above designated direct or indirect government contract." The regulations[5] prescribed for "war contracts" an "approved termination article for fix-priced contracts," which contained the stipulation that an "agency" might stop work upon any contract by a notice to terminate performance and that thereupon the contractor should "(3) terminate all orders and subcontracts to the extent that they relate to the performance of any work terminated." The clause in the "Purchase Orders" of course incorporated this privilege into the subcontract, and the defendant's notice to the Rumsey Company to stop work upon the "adapters" was not

---

3. § 845.521–3, Joint Termination Regulations, 9 Fed.Reg. 13359.
4. Stevens v. Federal Cartridge Corp., 226 Minn. 148, 32 N.W.2d 312.
5. § 849.931, Joint Termination Regulations, Vol. 9 Federal Register, p. 13400.

a breach of its obligations. Does the clause go further and allow to the plaintiffs the same measure of recovery against the defendant that the defendant would have had in a proceeding under the Act against the Navy? We think not. Obviously, the clause cannot incorporate all the procedure of the regulations for they in substance restate the whole Act, some parts of which would be inappropriate in an action. Nevertheless, it is possible to argue that the words, "covering termination," should be taken as so comprehensive as to mean to take over the measure of recovery accorded a contractor. It appears to us that so to read them imposes too heavy a burden upon the word, "subject," which qualified all that followed. The purpose of the clause appears to us reasonably plain. The defendant had entered into a contract with the Navy which allowed the Navy to cancel it when it wished; not only so, but in that event the regulations required the defendant to cancel the "Purchase Orders." Without the clause the defendant would not have been protected when it cancelled them; it was necessary to "subject" the Rumsey Company to the regulations so far. True, more limited words might have been used; but the dominant purpose is apparent, and to "subject" a promisee to an indefinite list of limitations is not the language of a grant; and especially not of the grant of a measure of recovery, borrowed from regulations, not as a whole made part of the contract. We interpret the clause as doing no more than "subjecting" the "Purchase Orders" to cancellation by the defendant when the Navy cancelled the "prime contract."

The case therefore comes down to the measure of damages at common law of a manufacturer and seller, whose performance the buyer has stopped by virtue of a stipulation in the contract. Obviously the seller is not entitled to any profits upon uncompleted goods. Profits consist of the difference between the sale price, taken as the minuend, and the cost, taken as the subtrahend; and, since by hypothesis the buyer has the privilege of stopping manufacture and the price is due only upon delivery, there is no minuend. Whether this would go so far as to deprive a manufacturer of profits on those goods which he had completed but not delivered, we need not say, for the defendant has paid for all such. There is ample authority for this result, when the goods have not been finished.[6] On the other hand, although when the promisor has the privilege of cancelling, the contract may not give expressly the manufacturer the right to recover his expenses; clearly he must have that relief; and it makes no difference whether we regard it as a term of the contract, implied in the sense that the parties would have so agreed, had they been faced with the problem; or whether we say that the law raises it *ex aequo et bono*. The situation appears to have arisen less often than one might expect, but in Barrett Company v. United States[7] the Supreme Court passed upon it, although under a statute which gave "just compensation" to the manufacturer. In the opinion, 273 U.S. at page 235, 47 S.Ct. at page 412 it said: "Just compensation for canceling the contract requires that the contractor shall be made whole and recover the expenditures necessary to perform the contract"; and the Court of Claims has several times followed this decision in similar situations.[8] Indeed, as we understand it, the defendant does not dispute the plaintiffs' right to recover the Rumsey Company's out of pocket expenses up to

6. College Point Boat Corp. v. United States, 267 U.S. 12, 45 S.Ct. 199, 69 L. Ed. 490; Delaval Steam Turbine Co. v. United States, 284 U.S. 61, 52 S.Ct. 78, 76 L.Ed. 168; Buffalo Union Furnace Co. v. United States Shipping Board Emergency Fleet Corp., 2 Cir., 291 F. 23, 28; Todd Dry Dock, etc., Corp. v. Sumner Iron Works, 9 Cir., 289 F. 217, 220.

7. 273 U.S. 227, 47 S.Ct. 409, 71 L.Ed. 621.

8. Harrisburg Pipe Co. v. United States, 67 Ct.Cl. 138, 151: American Propeller & Manufacturing Co. v. United States, 14 F.Supp. 168, 17 F.Supp. 215, 83 Ct.Cl. 100, 126; International Arms & Fuze Co. v. United States, 101 Ct.Cl. 297, 354.

the date of cancellation and we adopt that as the measure of its damages.

■ The judge found that that company had expended for "Direct Labor," $13,753.26; for "Indirect Factory Expenses," $41,939.19, and for "Dies, Jigs, Fixtures and Special Tools," $1,760.32; and for "General and Administrative Expenses," $18,190. The defendant does not object to these figures, but the plaintiffs do on their appeal. We have already disposed of the item of profit, which was allowed at $10,000, so that on the defendant's appeal there remains only an item of $18,189.10 for "actual expense of settlement, legal, clerical, accountants, storage, etc.". All of this item was for costs incurred after cancellation, and none of it is allowable except the item for "storage," for reasons which we shall give in a moment. The other parts the judge allowed because, although the plaintiffs were suing at common law, he appears to have supposed that they might invoke the provisions of the Act, particularly § 6(d)(3), in assessing its damages. As we have already seen, the right to recover in an action at law any of the items specified in § 6(d), assuming that it exists at all, is limited to an action brought under § 13(b) (2): that is, to an action brought after the "agency," responsible for the settlement of the claim, has passed upon it by findings under § 13(a). The Rumsey Company had its chance to follow that procedure and, as we have said, explicitly repudiated it on December 21, 1946, and in the language of the judge; "by this action * * * waived its right to any recovery under the Act." It seems hardly necessary to labor the argument that at common law a promisee may not recover for any part of his expenses in preparing for trial, whether these be what he pays his accountants, his experts or his lawyers. He is confined to the costs awarded by statute. Therefore, we disallow all of this item except the cost of "storage." That item arises from the fact that part of the property in the possession of the Rumsey Company at the time of the cancellation was "forgings" which the defendant had delivered to it for use in the manufacture of the "adapters"; and apparently the same was true of some of the dies, jigs, etc. In any event the defendant asked the company to store these until a convenient season; and this request may also have included some material and incompleted "adapters." Obviously the plaintiffs are entitled to be reimbursed for this storage, which goes into a substantial figure; but, since the record does not contain enough to allow us to liquidate the item, the case must go back for that purpose, unless the parties can agree. Upon the defendant's appeal we disallow the item of profit and all of the item of post-cancellation expenses except storage.

■ The only questions upon the plaintiffs' appeal are the amount allowed for "Direct Labor," for "Indirect Factory Expense," for "Dies, Jigs, Fixtures, Special Tools," and for "General and Administrative Expenses." The judge appraised the items very largely on the basis of negotiations before the action was brought between the Rumsey Company and a "cost inspector" of the Navy, who became a witness for the defendant on the trial, as its expert accountant. The plaintiffs retained their own accountant and the two did not agree, as was to be expected. The first item. "Direct Labor," was taken from the books of the Rumsey Company, and the amount allowed by the defendant's accountant was ninety per cent of that claimed by the plaintiffs. We see no reason to disturb the judge's acceptance of the defendant's figure. It was much easier to learn what labor was used in working up the material into "adapters" and so to get the "Direct Labor," than to allocate the proper part of the "Indirect Factory Expense," or of "General and Administrative Expense." These two items both accountants divided by finding the proportion of all the direct labor cost in the factory which the direct labor on the "adapters" represented; and this they used as a multiplier. As their multiplicand they made up an aggregate of items found on the Rumsey Company's books, which they regarded as the total "Indirect Fac-

tory Expense" and "General and Administrative Expense" during the period in question. As we have seen, they started with slightly different "direct labor" costs, but their differences as to the two other items were much larger than would have resulted, had they used the same multiplicand. Obviously no rigid principles are possible in forming the aggregate of either item; it must be to some extent a matter of opinion what items to include, and indeed it would be difficult to say that any aggregate was clearly too small which a competent accountant honestly thought comprehensive enough. The judge somewhat raised the item of "General and Administrative Expenses," which the defendant's accountant had allowed, because he recognized that accuracy was impossible and because he wished to be on the safe side. The plaintiffs have not singled out any items which he omitted but should have included; and his preference for the opinion of one accountant against the other may have resulted from impressions he got of their relative competence and candor; as the record stands it would be entirely improper to say that his choice was "clearly erroneous." The same applies to the other items: "Dies, Jigs," etc. Thus, except for the item of "storage" the plaintiffs' appeal must fail. The judgment will be modified by deducting the item of profit—$10,000—and the item, "Legal, Clerical, Accountants, Storage, etc."—$18,189.10—save so much as the plaintiff can prove for "storage"; and as so modified, it will be affirmed.

■ From what we have said regarding the nature of the action and its exemption from the Act, the answer has already appeared as to the rate of interest upon the recovery. It is only an action in contract between two private corporations, and the rate of interest is that which the state law allows in such cases. We are not advised whether the United States will pay the judgment; but we will so assume, for it makes no difference. There was no way by which the "agency" could force the Rumsey Company to submit the settlement of its claim against the defendant to the procedure laid down in the Act, if it remained obdurate as it did. That is indeed a corollary of the conclusion that the plaintiffs may sue at law. Perhaps it is a defect in the Act, but it was clearly deliberate, and it cannot be eliminated, even though it may be thought to run counter to the underlying purpose of a quick disposition of all such claims. In seeking to limit interest to two and a half per cent under § 6(f) the defendant invokes exactly that "hybrid" interpretation, of which it complains when the plaintiffs invoke it. Interest will be allowed at six per cent. The defendant will be allowed its costs and disbursements on this appeal.

Judgment modified, and cause remanded for further proceedings in accordance with the foregoing opinion.