**UNITED STATES of America,**
**Appellant,**

v.

**R. H. TAYLOR et al., Appellees.**

**No. 20516.**

United States Court of Appeals
Fifth Circuit.

June 22, 1964.

Adhered to on Rehearing Sept. 14, 1964.
See 336 F.2d 149.

Robert E. Hauberg, U. S. Atty., E. R. Holmes, Jr., Asst. U. S. Atty., Jackson,

Miss., Alan S. Rosenthal, Stephen B. Swartz, Attys., Dept. of Justice, Washington, D. C., John W. Douglas, Asst. Atty. Gen., for appellant.

Vardeman S. Dunn, Jackson, Miss., Bruce C. Aultman, Hattiesburg, Miss., William H. Cox, Jr., Jackson, Miss., Simrall, Aultman & Pope, Hattiesburg, Miss., Cox, Dunn & Clark, Jackson, Miss., of counsel, for appellees.

Before HUTCHESON and GEWIN, Circuit Judges, and HOOPER, District Judge.

HUTCHESON, Circuit Judge.

The United States as assignee of its contractor's claims and demands against a subcontractor for contractual overpayments instituted this action for recovery on those claims.[1] An order granting appellee-subcontractor's motion for summary judgment was entered, and the United States appeals that order. The order was in error. The United States' motion for summary judgment should have been granted. On this appeal the primary questions before the court are, what law applies to the interpretation of a disputes clause in a subcontract under a contract to perform work on a government project and how such a clause should be interpreted.

Peter Keiwit Sons contracted with the United States Government acting through the Atomic Energy Commission for the construction of a gaseous diffusion plant near Portsmouth, Ohio. On March 3, 1953, appellee Taylor-Wheless[2] entered into a subcontract with Keiwit to remove and grade dirt at the plant site. The subcontract required that payment should be made to the subcontractor on the basis of the number of cubic yards of material acceptably excavated. The amount of material excavated was to be determined by measuring it "in original position from cross-sections taken before stripping and after excavation and computed by the average end area method." The parties later orally agreed to substitute the load count method for the average end method of material measurement as a practical way of making periodic quantity determinations upon which to base progress payments.

The work under the subcontract was completed in November, 1953. Keiwit then computed by the average end area method the work performed by Taylor-Wheless. Based on this computation in November, 1954, Keiwit issued Taylor-Wheless a final pay estimate indicating that payments made by the load count method exceeded those due under the average end area method, after subtracting retainage, by approximately $383,000.00. Taylor-Wheless rejected this estimate as inaccurate. Keiwit requested the Atomic Energy Commission to employ an independent survey group to determine if there was an overpayment. Such a group was employed, and they concluded that under the average end area method the overpayment less retainages amounted to $337,973.52. This computation presented to Taylor-Wheless on July 25, 1955, was also refused as inaccurate.

The parties failed to resolve their dispute and Keiwit referred the dispute to the Commission's General Manager of Oak Ridge Operations under the provisions of the subcontract's disputes clause. The clause was subsequently amended by agreement between the parties to provide for disputes determination by the Commission. The dispute was, therefore transferred to the Atomic Energy Commission Advisory Board of Contract Appeals (Board). No hearing had been held prior to this transfer.

The Board, after a hearing, found that after Keiwit's initial submission of the dispute, as prescribed by the disputes clause of the contract, Keiwit and Taylor-Wheless agreed to modify the dis-

---

I.  2S U.S.C.A. § 1345.

2.  Appellees will be referred to as Taylor-Wheless for convenience. They are, in fact, R. H. Taylor and J. L. Taylor individually and as co-partners in Taylor-Wheless Co., and Taylor-Wheless Co., Inc., successor in business to the partnership.

putes clause by agreeing to submit disputes to the Commission rather than the Manager of Oak Ridge Operations. They further found that Taylor-Wheless and its attorney suggested times and places of hearing, that the chairman set a hearing, that Taylor-Wheless indicated it was preparing for the hearing, agreed to a postponement of the hearing date, requested further postponements of the hearing, and, after failing to negotiate a settlement with Keiwit in December, 1956, objected to the jurisdiction of the Board and withdrew from the proceedings.

The Board proceeded to determine the issue as to overpayment under the average end area method of computation. Taylor-Wheless did not participate in the hearing. The Board did consider a document previously presented Keiwit by Taylor-Wheless entitled "Statement in Support of Taylor-Wheless Co.'s Final Estimate". The document attempted to justify accuracy of the load count computations and attacked the accuracy of the average end area computations made by Keiwit prior to the independent survey. After considering oral and documentary evidence and Keiwit's brief, the Board found an overpayment in the amount determined by the independent surveyors. They relied on this survey since they found that there was no showing that the final figures reflected inaccurate application of the computation principle called for in the contract,[3] and there was adequate basis in the record for finding that the computations were accurate. This fact finding of an overpayment of $337,973.52 was adopted by the Deputy General Manager of the Atomic Energy Commission on April 8, 1958.

On August 4, 1958, the Commission's Portsmouth Area Manager, as Contracting Officer, determined Keiwit's overpayment to Taylor-Wheless was an allowable cost and discharged Keiwit from any obligation with respect to government funds advanced for these payments. On August 19, 1958, Keiwit assigned its claims for overpayment against Taylor-Wheless to the United States. The United States instituted this action in the district court praying for judgment in the amount of the disputes award on both the decision of the Board and the underlying claim. Taylor-Wheless moved to dismiss, then moved for summary judgment on the grounds that: withdrawal from the disputes procedure invalidated the award; the Atomic Energy Commission and not the Board was the proper hearing agency; the assignment was invalid and unenforceable; and, finally, the suit constituted a suit on an implied contract and was, therefore, barred by the Mississippi Three Year Statute of Limitations.[4] The United States moved for summary judgment on the grounds that the award and the underlying claim were valid, viable, and enforceable. The court granted the motion of Taylor-Wheless and denied that of the United States.

The court held that: the parties had entered into an arbitration agreement; this was a remedial rather than a substantive matter; and the law of Mississippi would apply to the enforcement of the agreement in a suit such as this in which the government claimed as assignee. Under Mississippi law the court held that "a party has a complete right to withdraw from arbitration proceedings any time prior to the making of an award". Therefore, the court reasoned the award was invalid. Both parties admit that this is an accurate statement of the law of Mississippi. They both rely on McClendon v. Shutt, 237 Miss. 703, 115 So.2d 740 (1959) and Machine Prod. Co. v. Prairie Local No. 1538, 230 Miss. 809, 94 So.2d 344, 95 So.2d 763 (1957).

The government insists, however, that federal law applied to the interpretation

---

3. Taylor-Wheless has never asserted that there had been an inaccurate application of the end count principle by the independent surveyors.

4. Sec. 729, Miss.Code (1942).

of subcontracts executed under government contracts and that, under such law, administrative remedies must be exhausted before resort is made to the courts. They rely on American Pipe & Steel Corp. v. Firestone Tire & Rubber Co., 292 F.2d 640 (9th Cir. 1961). Here the court applied federal law to the interpretation of a subcontract under a federal contract since the area was one dominated by the sweep of federal statutes, the contracts were connected with national security, and, in this instance, a possible increase in the cost of national security was involved. The government is correct. The subcontract in this case would be interpreted by federal law under the sweeping command of the Firestone decision. It is not necessary, however, to paint with such a broad brush.

■ The trial court erred in treating the disputes clause as an agreement to arbitrate which ousted the court of jurisdiction and was historically viewed with a jealous eye by the courts. The clause is an ordinary disputes clause and so far as possible should be treated as similar clauses in contracts between the government and its contractors. The subcontract disputes clause reads as follows:

"ARTICLE VIII—DISPUTES

"Except as otherwise specifically provided in this subcontract any and all questions, issues, and disputes arising under this subcontract shall be settled if possible by negotiations and mutual agreement of the parties hereto, but in the event of their inability to agree, shall be decided by the Commission's Manager of Oak Ridge Operations or his duly authorized representative, representatives or board, whose decision shall be final and conclusive on the parties. In the meantime, the Subcontractor shall diligently proceed with the contract as directed."

This clause was modified by mutual agreement on February 28, 1956 substituting the word "Commissioner" for the words "Commission's Manager of Oak Ridge Operations or his duly authorized representative, representatives or board".

■ The disputes clause in a contract between the government and a contractor has long been recognized and approved as a valid provision for the determination of fact issues arising out of the contract.[5] The purpose of the clause is to provide for a quick efficient determination of disputes on an administrative level, thus mitigating or avoiding large claims which might otherwise arise.[6] The Atomic Energy Commission has made its disputes settlement procedure available to parties to subcontracts under contracts let by them.[7] And the Commission regulations are written in terms of appeals by contractors of subcontractors.[8]

■ In this case the parties to the subcontract have adopted this method of disputes determination between themselves. The subcontract is one in which many aspects of the relations between the contractor and the subcontractor were directly supervised by the government.[9] The contract under which this

5. United States v. Moorman, 338 U.S. 457, 460, 70 S.Ct. 288, 94 L.Ed. 256 (1950).

6. United States v. Joseph A. Holpuch, 328 U.S. 234, 239, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946).

7. 10 C.F.R. Sec. 3.1 (1959) (In effect during all periods here pertinent). See Cuneo, Disputes Between Sub-Contractors and Prime Contractors Under Government Contracts, 16 Fed.Bar J. 246 (1956).

8. 10 C.F.R. Secs. 3.1 et seq. (1959) (In effect during all here pertinent).

9. "SUBCONTRACT ART. II The Commission had to approve any change in the scope of the subcontract that the contractor might wish to make. The Commission had to approve any equitable adjustment in the cost of the subcontract due to such changes.
"ART. IV Contractor's findings of material changes in condition that would re-

subcontract was let was a cost type contract, and in fact the cost of the alleged contractual overpayment was assumed by the government as discussed above. The expeditious administrative determination of disputes arising under this contract is a matter of such importance to the federal government that the law controlling such determinations between government and prime contractors so far as applicable should apply to the construction of the disputes clause.

■ We are aware, as was the court in American Pipe and Steel Corp. v.

sult in an increase or decrease in cost to the subcontractor must be concurred in by the Commission.

"ART. VI The disputes clause quoted in Text.

"ART. IX Neither the subcontractor, nor any interest therein, or claim thereunder, nor any sum or sums which may be due thereunder, shall be assigned without the written approval of the contractor and the Commission.

"ART. XI Subject to the approval of the Commission the contractor could terminate the subcontract for reasons other than breach of the subcontract provisions.

"ART. XII(2) Any time after the completion of 50 per cent of the work the contractor might make the remaining partial payments in full to the subcontractor with the approval of the Commission.

"ART. XII(3) All material and work covered by partial payments made became the sole property of the government.

"ART. XII(4) The amount due under the contract after completion and acceptance of all work would be paid the subcontractor after subcontractor furnished contractor with a release of all claims against the contractor and the government arising by virtue of the contract.

"The contract also evidences many instances of direct control over the subcontractor by the Commission.

"ART. XIII(b) The subcontractor agreed to conform to all security regulations and requirements of the Commission.

"ART. XVII The subcontractor agreed to comply with all health, safety, and fire regulations of the Commission.

"ARTS. XXI and XXII The Commission shall always have access to drawings and specifications, and all memoranda of record value were to be property of the government.

Firestone Tire & Rubber Co., 292 F.2d 640 (9th Cir. 1961), that there is generally considered to be no privity between a subcontractor and the government when the issue is whether the subcontractor may sue the government. We also recognize the validity of opinions applying state law to the construction of contracts between government contractors and their subcontractors.[10] However, it is clear that federal law will control contracts between private parties if there is sufficient federal interest.[11] It is just such an interest that we have outlined above.

"ART. XXVIII The subcontractor agreed to save the contractor and the government harmless from all suits, claims, and demands arising out of the work.

"ART. XXXI Subcontractor agreed to comply with all federal and state, and other laws and regulations applicable to the work performed.

"ART. XXXVII The subcontract was subject to the written approval of the Commission.

"The subcontract also contained many provisions often found in contracts between the United States and a prime contractor.

"ART. XV Subcontractor shall not employ any person undergoing sentence of imprisonment at hard labor.

"ART. XVI Subcontractor in performing the work shall not discriminate against any employee or applicant for employment because of race, creed, or color, or national origin.

"ART. XVIII No Congressman or Commissioner shall benefit from this subcontract.

"ART. XIX Subcontractor agreed that he had not employed anyone to solicit the contract on a contingent fee basis.

"ART. XXXIII Subcontractor agreed to use domestic articles in the construction unless the Commission determined otherwise.

"ART. XXXVII The subcontract was made subject to the Renegotiation Act."

10. Rumsey Mfg. Corp. v. United States Hoffman M. Corp., 187 F.2d 927 (2d Cir. 1951); D. W. Winkleman Co. v. Barr, 178 F.2d 341 (6th Cir. 1949).

11. Cf. Bank of America Nat. Trust & Sav. Ass'n. v. Parnell, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956).

Though the question of what law applies to interpret a disputes clause in a subcontract has apparently never arisen before, federal courts have applied the body of law surrounding the interpretation of disputes clauses in government contracts to a similar clause in private subcontracts under government contracts. In United States v. United Enterprises, 226 F.2d 359 (5th Cir. 1955), a Miller Act dispute between a contractor and a subcontractor, the private subcontract contained a clause providing that the United States Engineer would determine construction and meaning of drawings and specifications. His determination was held binding on the subcontractor under the authority of United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288 (1950) and United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951). Both of these cases involve the construction under federal law of the typical disputes clause in a government contract. In E. I. DuPont DeNemours & Co. v. Lyles & Lang Const. Co., 219 F.2d 328 (4th Cir. 1955), a disputes clause in a private subcontract under a government contract was held inapplicable to a dispute of law. The court cited as authority cases involving disputes clauses in government contracts, United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154 (1951) and United States v. J. A. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000 (1946). The court also held that as an arbitration agreement the clause was inapplicable. Despite the language analyzing the clause as an arbitration agreement, the case has been cited as au-

thority for the interpretation of disputes clauses in government contracts in United States v. Hamden Co-Operative Creamery Co., 297 F.2d 139 (2nd Cir. 1961) and Jacobs v. United States, 239 F.2d 459 (4th Cir. 1956). There are still more examples of the application of federal law to clauses in private subcontracts and the law of the private subcontract cases to government contract cases. In Liberty Products Corp. v. H. K. Ferguson Co., 90 F.Supp. 673 (E.D. N.Y.1950) a disputes clause in a private subcontract was held governed by United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288 (1950) a public contract case; and in Moran Towing & Transp. Co. v. United States, 192 F.Supp. 855 (S.D.N.Y. 1960) the Liberty Products case was cited as authority for interpreting a disputes clause in a government contract case. In this opinion we merely verbalize what is implicit in the foregoing decisions.

■ The application of federal law to this disputes clause to determine the effect of withdrawal on the subsequent ex parte award is in this case made simple for us by the Atomic Energy Regulations governing disputes.[12] The Regulations specifically provided that "In the event of the unexcused absence of a party at the time and place set for a hearing, the hearing will proceed and the appeal will be deemed as having been submitted without oral testimony or argument on behalf of that party." [13] Withdrawal does not invalidate the award any more than a withdrawal would invalidate a disputes determination by

---

12. 10 C.F.R. Secs. 3.1–3.40 (1959) (In effect during all time here pertinent).

13. 10 C.F.R. Sec. 3.20 (1959). Though the Regulations, note 13, supra, speak only to a disputes procedure that submits the dispute first to the parties, then to a hearing examiner, and finally by appeal to the Board for a de novo determination, the fact that the parties choose to omit the submission to the hearing examiner, an omission acquiesced in by the commission's approving the contract and making the Board available to the

parties, does not exempt them from the plainly declared ex parte policy of the board. The factual determination of the board is binding on the subcontractor though he was absent from the hearing. This is true unless such a factual determination is found to be "fraudulent (sic) or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." 41 U.S.C.A. § 321 (1954). No attack has been here made on the fact findings of the Board.

an architect or engineer in a private contract.

■ The remaining issues are easily disposed of. The district court held that the amended disputes clause called for determination by the commission and that representatives of the commission were eliminated from the clause by omitting reference to them in the amended version. The implication of this was that the Board which heard the dispute was not designated in the clause, and, therefore, its decision was of no effect. The omission of the reference to representatives in the amended clause might be troublesome had not the subcontract defined Commission as the Commission or its duly authorized representatives. The Board was the proper administrative body to determine the dispute.[14]

■ The district court held that the assignment of all claims for overpayment to the government materially prejudiced the rights of Taylor-Wheless, since Taylor-Wheless could not counter claim against the government for retainage, nor did it have the same powers of discovery against the government to which it would have been entitled had the litigation been between parties to the contract. We need not determine the accuracy of this holding. The short of it is that the subcontract provided that "This Subcontract, or any part thereof, is assignable to the Government by the Contractor." No matter what the case absent this clause in the subcontract, given its presence the claims to overpayment were validly assigned to the government.

14. 10 C.F.R. Sec. 3.3 (1959).

15. Note 3, supra.

16. United States v. John Hancock Mut. Life Ins. Co., 364 U.S. 301, 81 S.Ct. 1, 5 L.Ed.2d 1 (1960); United States v.

■ The district court finally holds that the Mississippi three year statute of limitations bars recovery.[15] Possibly applicable to the underlying claim, though we express no opinion on the matter, the statute is not applicable to a suit based on the disputes award made merely a few days more than one year before the assignment. The statute, of course, ceased to run at the time the claim is assigned to the government.[16]

■ Taylor-Wheless in this court asserts that, since the disputes clause indicated that the subcontractor should proceed with the contract during the determination of disputes, the clause is applicable only to disputes arising during the performance of the contract. This is a much litigated issue. The better view is that the clause has no such limitation.[17] Again, however, we do not have to determine this issue. The act of the parties in modifying the disputes clause after the termination of the work under the subcontract conclusively demonstrates that the clause was to apply to post completion disputes. This was so found by the Board.

There are no further legal issues to be determined and no facts in dispute. We hold that the judgment below must be reversed and the cause be remanded with directions to enter judgment for the United States.

The judgment of the district court is hereby reversed and remanded for further proceedings not inconsistent herewith.

Summerlin, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940).

17. Silverman Bros. Inc. v. United States, 324 F.2d 287, (1st Cir. 1963).