## Crowell v. H. L. Yoh Co., Inc.

*Jacob J. Siegal, Meltzer & Schiffrin,* for plaintiff.

*Edwin P. Rome, Blank, Rudenko, Klaus & Rome,* for defendant.

McCLANAGHAN, J., December 8, 1969.—On December 31, 1953, defendant contracted with the United States of America for the preparation of descriptions for the Signal Corps according to the Federal standards of item identification (prime contract). The contract covered 120,000 each item for the consideration of $346,800, with deliveries to be made commencing January 1, 1954, through April 30, 1955. On August 10, 1954, by modification no. 3, the said contract was amended; and due to delays caused by the governmental agency, the delivery dates were revised to commence January 1, 1954, through April 30,

1956. Under certain circumstances, the completion date could be extended, but not beyond June 30, 1956. The amended contract reduced the quantity of items to 95,000 each item from 120,000 each item and increased the prime contract price to $419,256.25.

Prior to said December 31, 1953, defendant had advised plaintiff that it was considering entering into the prime contract, and that it would subcontract with others for part of the materials and work called for under said contract. Subsequently, on March 15, 1954, plaintiff and defendant entered into a written agreement wherein and whereby plaintiff would supply and perform part of the materials and work called for under the prime contract, to wit:

(a) Furnishing and embossing addressograph plates according to certain procedures;

(b) Furnishing and attaching tabs to each of the addressograph plate forms, in accordance with said procedures;

(c) Print on 3 x 5 cards the information contained on said addressograph plates, and

(d) Packing and addressing said 3 x 5 cards, in accordance with certain specifications.

Following modification no. 3 of the prime contract, plaintiff and defendant orally cancelled their written agreement of March 15, 1954 (exhibit "A") and entered into a written agreement dated October 27, 1954 (exhibit "B"). Under exhibit "B" defendant was to furnish plaintiff with transmittal forms as promptly as defendant received the same under the prime contract. Plaintiff was thereafter to furnish the materials and perform the work involved, in performing according to certain written procedures, that part of the prime contract as follows:

(a) Furnish and emboss addressograph plates for the approximate amount of 235,000 frame and plate units at a unit price of $230 per thousand;

(b) Furnish and attach tabs to each of said frames at a unit price of $18 per thousand;

(c) Print, pack and address approximately 7,000,000 3 x 5 cards, at a unit price of $4.50 per thousand.

The agreement between the parties provided that plaintiff would perform its work in accordance with the pace at which defendant would furnish plaintiff with materials necessary for plaintiff to perform its work. Defendant agreed that to the extent that the matter was within its control, the work to be performed by plaintiff would not extend beyond two years from the date of the subcontract of October 27, 1954.

In the contract of March 15, 1954 (exhibit "A") and in the contract of October 27, 1954 (exhibit "B"), it was provided:

". . . it is understood that this contract is subject to the same conditions and limitations that are contained in said Signal Corps' contract, . . ."

During the course of the contract between defendant and the government, and of the contract between plaintiff and defendant, defendant, by reason of certain delays caused by the governmental agency, had requested the government to consider an equitable adjustment to relieve defendant from the large losses and damage occasioned by the governmental agency's actions. Defendant requested an equitable adjustment of $798,262 over and above the contract price of $419,256.25. While defendant's request was being processed, defendant continued to perform under the prime contract and plaintiff continued to perform under its subcontract with defendant. On April 18, 1956, defendant had advised the government that while the contract provided for termination on April 30, 1956, an estimated additional period of 47 weeks would be required in order to complete the program. The government thereupon instructed defendant to

proceed with the delivery requirements and on April 30, 1956, defendant transferred all work in progress to the government.

Under the agreement marked exhibit "B," the quantity of work to be performed by plaintiff was reduced but the rate of payment was increased. It is averred that pursuant to the contracts (exhibits "A" and "B"), plaintiff purchased materials in the amount of $14,227.55, incurred direct labor costs of $23,016.50, overhead charges of $27,036.67 and depreciation of $9,948.75, totalling $74,229.47. Plaintiff was paid $29,903.85 for work performed. Plaintiff's claim of $54,648.01, plus interest and costs, is arrived at by deducting $29,903.85 from said $74,229.47 to reflect a loss of $44,325.62. To this sum is added anticipated profit of $10,372.39, making a total claim of $54,698.01.

After negotiations, covering a period of several years, the government agreed to recognize the prime contract as having been 74.28 percent completed, and thereafter agreed to pay defendant $164,060.02, in addition to a sum equal to 74.28 percent of the prime contract price, or $323,439.98, making a total payment by the government to defendant of $487,500. Defendant, on July 19, 1957, had submitted to the government a cost breakdown totalling $844.541.45, and defendant thus claims to have suffered a loss under the prime contract of $357,041.45.

In the settlement item of $164,060.02, there was included by the government a payment to defendant of $5,000 under the caption "Subcontractor's Claim." The government's report of the recommended settlement with defendant indicated that counsel for defendant was empowered to represent the subcontractor, and although defendant ventured that the subcontractor's claim could be settled for $10,000 to $15,000, defendant agreed to the amount of $5,000 offered by the government and granted a release to the

government of any future claims arising out of said subcontract. Moreover, on June 9, 1958, in accepting the government's contract settlement offer of $487,500, defendant, through counsel, agreed that included therein was the subcontractor's claim, if any, which we (defendant) shall meet, if and when it arises.

Plaintiff alleges that both previous and subsequent to the settlement of defendant's claim against the government plaintiff had frequently demanded that defendant pay to it the amount provided by the subcontract; that prior to settlement with the government, defendant had advised plaintiff it could not settle with plaintiff until it completed settlement negotiations with the government. After said settlement, plaintiff and defendant were unable to agree upon the amount of compensation defendant was obliged to pay plaintiff under the subcontract.

In the written contracts (exhibits "A" and "B"), between plaintiff and defendant, it is set forth that the prime contract of December 31, 1953, and various supplements thereto, had been exhibited to plaintiff and were available for its inspection at any time, at the office of defendant.

Plaintiff denies that in defendant's settlement negotiations with the government said defendant was empowered to represent plaintiff in re its claim. Plaintiff denies that it should have presented its claim to the government contracting officer, and disputes the claim of defendant that plaintiff was free to participate in the settlement negotiations with the government, but chose not to do so. Plaintiff alleges that Government regulations specifically prohibited the government contracting officer from participating in disputes between the prime contractor (defendant) and the subcontractor (plaintiff). Plaintiff avers that defendant unilaterally terminated the prime contract

by abandoning performance thereunder, not because performance was impossible, but because performance was onerous and costly. Plaintiff avers that the delays encountered were foreseeable, especially in view of the modification of August 10, 1954, and, therefore, defendant could and should have protected itself in its contract.

On the other hand, defendant argues that, by reason of the modification of the prime contract and by reason of the substitute contract (exhibit "B") between plaintiff and defendant, plaintiff was fully cognizant of past delays and of delays that could reasonably be expected to occur in the future, and plaintiff, having failed in its contract with defendant to protect itself against said delays, now has no right to be compensated by defendant for any losses caused by said delays, all of which were occasioned by the government agency. First, as against the United States Government on the prime contract, plaintiff not being a party to said contract, direct privity did not exist. Second, did the reference to the prime contract in the contract between plaintiff and defendant invest in plaintiff such indirect privity as to permit a recovery by plaintiff against the government? We think not. Nor has any authority been cited to show that plaintiff could directly assert a claim against the government by lodging the same with the government contract officer. It seems, therefore, that in the equitable adjustment afforded defendant by the government, the inclusion of the sum of $5,000 under the caption, "Subcontractor's Claim," did in no way reflect a recognition by the government that plaintiff had or could have a legitimate claim against the government by reason of the subcontract with defendant. The inclusion of said item was a defensive mechanism on the part of the government whereby, in consideration of said sum, defendant undertook to hold the govern-

ment harmless in the event a claim was asserted by plaintiff.

Under the circumstances, did the action of defendant of said April 30, 1956, in surrendering to the government all work in process, amount to a breach of the prime contract? Delays occasioned solely by the government prevented performance in accordance with the contract. Performance by defendant was conditioned upon performance by the government and the latter admitted that the delays were caused by it. It is not disputed that performance could not be completed by the specified expiration date of April 30, 1956. The government and defendant were unable to agree upon a period of extension of the time for performance. How can it be said that the action of defendant in surrendering to the government all work in progress on the date fixed for termination is a breach of said contract? Did not the contract by its very own terms expire? If defendant had sought to extend the time of the subcontract beyond the two-year period agreed upon, it is clear that if plaintiff did not consent to said extension, it would not thereby breach said agreement. The prime contract having been abrogated, justice and good business judgment dictated that the subcontract terminate.

What right then did plaintiff have to recover against the government or against defendant? Having been paid in full by defendant for all work done under the subcontract, did plaintiff have any right to be compensated by the government or by defendant? Plaintiff asserts that defendant terminated the contract, not because performance was impossible, but because performance was onerous and costly, a situation against which defendant could have protected itself in its contract.

Plaintiff cites Moore v. Whitty, 229 Pa. 58 (1930), quoted in Luria Engineering Co. v. Aetna Casualty

and Surety Company, 206 Pa. Superior Ct. 333 (1965), as authority for imposing liability upon defendant where the acts of a third party (the government) making performance impossible, or causing delay resulting in substantial expense to the contracting party, do not excuse failure to perform, if such acts were foreseeable because it was the duty of the contracting party to provide for that situation in his contract.

Defendant alleges that performance by defendant was conditioned upon performance by the government and that performance by the government was the contingency about which both plaintiff and defendant were aware, but which neither could control. Defendant contends that plaintiff was aware of and assumed the risk of the nature of the government's performance, which was the condition precedent to defendant's performance. Defendant argues that under said circumstances it would be inequitable to permit plaintiff to recover of defendant: Union Paving Co. v. City of Philadelphia, 95 Pa. Superior Ct. 342 (1928).

In the instant case, the parties, after orally cancelling their written agreement, marked exhibit "A," then executed a new written agreement, exhibit "B," wherein the quantity of work to be performed was reduced but the rate price increased. Exhibit "B" seems to have been predicated upon the mutual knowledge, understanding and experience of the parties in performing under contract marked exhibit "A." Plaintiff, as well as defendant, had the duty and the opportunity to protect itself in its contract (exhibit "B"), but chose not to do so. Thus, the above cited cases are deemed inapplicable to the instant case. Clearly, the exhibit "B" was entered into by the parties with the knowledge and experience gained under exhibit "A." Consequently, the acts of the government causing de-

lays were foreseeable equally by both plaintiff and defendant.

Defendant alleges that the delays, not being within its control, totally excused it from liability, because in the contracts, exhibits "A" and "B," it is provided:

"2 D. It is understood that this contract is subject to the same conditions and limitations contained in the basic contract between Yoh and Signal Corps' Supply Agency . . ."

Defendant argues that he could not perform because the government did not perform and having delivered to plaintiff all the work he had received from the government, and having paid plaintiff therefor, that it had discharged its obligations to plaintiff: Acchione v. Commonwealth, 347 Pa. 562, and Union Paving Company v. City of Philadelphia, 95 Pa. Superior Ct. 342. We are not persuaded that these cases are dispositive of the current problem. The Acchione case was in the nature of an action for damages over and above the contract price based on delays sought to be charged to the contractor. The Union Paving case sought to recover anticipated profits where performance could not be had because of a situation occurring through the failure of a third party.

Where, as in the instant case, defendant received an equitable adjustment from the government of $164,060.02, plus a percentage payment of the contract price, is it inequitable to permit plaintiff a recovery of defendant for losses incurred in the performance of the subcontract, even though defendant allegedly sustained a loss of $357,041.45, over and above all payments made to it under the prime contract?

Plaintiff claims to be entitled to recover out-of-pocket expenses incurred under the subcontract. Plaintiff cites Rumsey Manufacturing Co. v. U. S. Hoffman Machinery Corp., 187 F. 2d 927, as authority for the

proposition that where by reason of cancellation of the prime contract, the contractor was entitled to terminate the subcontract, nevertheless, the subcontractor, while not entitled to recover anticipated profits, is entitled to recover his expenses on the theory that the parties would have agreed to that, if faced with the problem or, because just compensation requires that under said circumstances the contractor be made whole.

In the case of McDaniel v. Ashton-Mardian Company, 357 F. 2d 511, involving the standard government construction contract, it was held that a subcontractor may not recover against the contractor for losses due to delays which were caused not by the contractor, but by the government, when under the contract, the government had the right to make changes and incurred no liability because of the delays. It was held that the contractor was only entitled to recover the cost of implementing the changes and not to consequential damages because of the delays. The court concluded that the parties *did not* intend their subcontract to mean that the subcontractor could recover damages from the contractor for delays occasioned by proper change orders of the United States.

It seems that the intent of the parties, Crowell and Yoh, must be gathered from the contract between them, as interpreted in the light of their actions pursuant to said contracts. Certainly, it is reasonable to believe that both plaintiff and defendant anticipated that it was necessary that materials be purchased and labor be hired and be available, if plaintiff was to perform under exhibit "B" in such manner that the flow of work was to be expedited as required under the prime contract. Failure to have materials on hand and labor available would have resulted in delays attributable to plaintiff. It is clear that the intent of the parties was

that the work was to proceed as expeditiously as possible.

Plaintiff having been paid for all the work actually performed, could reasonably expect upon the contract being terminated that he would be reimbursed for the expense to which he had been put in purchasing materials and in hiring help, etc. Common justice and business judgment indicate that such must have been or would have been contemplated by the parties if and when called upon to face the problem. Unless such recompense is expressly negatived by agreement among the parties it must be construed to have been so intended by the parties. Otherwise, the flow of commerce would be so hampered as to defy expeditious dealings.

Therefore, we conclude that plaintiff herein is entitled to recover of defendant the expenses he incurred under this contract. However, the allegations of expenses or losses must be so particularly set forth that it can readily be ascertained that it is an expense or loss for which the parties may be said to have contemplated reimbursement.

In order that the expense or damage may be properly evaluated, it is directed that plaintiff file with the court a detailed itemization of the items composing the losses it alleges. When said itemization has been filed, defendant shall have 10 days to file objections thereto.